562 A.2d 1270

**Michael Anthony CHEW**

v.

**STATE of Maryland.**

**Nos. 146, 166, Sept. Term, 1987.**

Court of Appeals of Maryland.

Sept. 8, 1989.

Terrell N. Roberts III, Assigned Public Defender (Alan H. Murrell, Public Defender, Baltimore), on brief, for appellant.

Jillyn K. Schulze, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore), on brief, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

McAULIFFE, Judge.

Michael Anthony Chew was tried and convicted in the Circuit Court for Charles County of murder in the first degree, attempt to commit rape in the first degree, and third degree sexual offense. In a separate sentencing proceeding the jury decided that life imprisonment was the appropriate sentence for the murder, instead of the death sentence sought by the State. Chew appealed to the Court of Special Appeals, contending, among other things, that he was denied equal protection of the laws by the prosecutor's racially discriminatory use of peremptory challenges. The Court of Special Appeals, applying the principles of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69

(1986), which was decided after the Chew trial had been completed,[1] held that Chew had shown enough to raise a permitted inference of discrimination, and directed a remand to the trial court for further proceedings to determine whether there had been racial discrimination in the selection of the jury. *Chew v. State,* 71 Md.App. 681, 527 A.2d 332 (1987).

Chew sought certiorari, and we granted the writ on the limited question of alleged racial discrimination in the exercise of peremptory challenges. Prior to our granting the writ, however, the trial judge had conducted a post-trial hearing in accordance with the mandate of the Court of Special Appeals, and had ruled that a prima facie case of discrimination had been shown, but that the prosecutor had rebutted the presumption by demonstrating racially neutral reasons for the challenges made to black jurors. The trial judge thereupon affirmed the judgment of conviction, and the defendant again appealed. We granted certiorari on our own motion before that appeal was heard by the intermediate appellate court, and we consolidated the two proceedings.

On the first issue, involving the action of the Court of Special Appeals in remanding for a further hearing consistent with *Batson,* we agree with the Court of Special Appeals that the limited remand was appropriate. The judgment of the Court of Special Appeals, however, has now become moot. On the second issue, we are unable to accept the finding of the trial judge concerning the existence of a racially neutral explanation for the challenge of at least one black juror, and we must therefore reverse the convictions and remand for a new trial.

## I.

Chew is a twenty-eight year old black man. He was charged with the murder and attempted rape of a fourteen

---

**1.** The principles announced in *Batson* apply to all cases that were pending direct review at the time the decision was announced. *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).

year old white woman. Most of the State's witnesses were white. The principal State's witness, who had been the victim's boyfriend, and who Chew's attorneys suggested was the more likely suspect in the victim's death, was white.

The jury venire presented for voir dire consisted of 78 persons, of whom nine were black. The defendant challenged the array, suggesting that the black population in Charles County was thirty to thirty-five percent of the total, and that the venire did not represent a fair cross section of the community. The defendant offered no evidence concerning jury selection procedures, and the challenge to the venire was denied. *See State v. Calhoun,* 306 Md. 692, 709–12, 511 A.2d 461 (1986) (successful challenge to the array requires, inter alia, proof that underrepresentation is due to systematic exclusion of the group in the jury selection process). Chew has not appealed from that ruling.

Voir dire of the panel began with a roll call of the prospective jurors. As the name of each juror [2] was called, that person stood, and remained standing until the next person's name was called. Upon completion of the roll call, the judge conducted the voir dire questioning, and the appropriate challenges for cause were made. The remaining prospective jurors were then called to the rail, twelve at a time, and peremptory challenges were announced. Each juror against whom no challenge was announced took a seat in the jury box. When twelve persons were in the box, the parties were afforded an additional opportunity to announce a peremptory challenge.[3] If persons in the jury box were challenged, the process at the rail continued. When there were no more challenges to the twelve persons in the box, the necessary number of alternates were selected in the

---

2. For convenience, we use the term "juror" instead of the more precise terms of "prospective juror" or "venireperson."

3. Maryland Rule 4–313(b)(3) provides that a peremptory challenge may be made at any time before the jury is sworn.

same manner, after which the jury and alternates were sworn.

During the selection of the twelve jurors, the State exercised seven peremptory challenges, three of which were against black jurors. Two of the challenges to black jurors, those involving Alonzo Carroll and Jane Hawkins, were made at the rail. The third, involving Emma Marshall, was made after the juror had been seated in the jury box.

The State was entitled to one peremptory challenge for each of the two alternate jurors to be selected, and it exercised one of those challenges against Deborah Stovall, a black woman called to fill the first alternate's position. The State did not exercise a peremptory challenge against a black woman who was selected as the second alternate juror. The jury as finally selected was made up entirely of white persons. The first alternate juror was white and the second alternate was black.

At the conclusion of the selection process, the defendant's attorneys moved for a mistrial, contending that the State had improperly exercised its peremptory challenges in striking black jurors. Effectively forecasting the decision in *Batson* that was yet to come, Chew's attorneys argued that the exercise of four of the State's challenges against blacks in such a manner that no black person was allowed on the jury "shifts the burden" to the State to "state the basis for striking the black ... members that it did strike." The trial judge held, consistent with the then existing law of *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), that in the absence of some showing of an office policy or consistent pattern of conduct embracing more than a single case, the prosecutor was not required to give any reasons for the exercise of his peremptory challenges. The motion for mistrial was denied.

Two days later, at the beginning of the third trial day, the State's Attorney and his deputy approached the bench for the purpose of dictating into the record the reasons they had exercised peremptory challenges against the four black

jurors.[4] The trial judge received the volunteered explanations as well as the defendant's attorneys' observations concerning those explanations, but made no comment concerning them.

## II.

The first question raised by Chew concerns the propriety of the limited remand ordered by the Court of Special Appeals upon the first appeal. We agree that the action was appropriate in this case. We addressed this issue in *Stanley v. State,* 313 Md. 50, 542 A.2d 1267 (1988), and there directed a limited remand for each of the two defendants involved. As we acknowledged in *Stanley,* certain difficulties are inherent in attempting to reconstruct events that occurred a year or more earlier, but where a reasonable possibility exists that reconstruction can be fairly accomplished, the attempt is worth the effort. Should it appear to a trial judge presiding at a limited remand hearing that the passage of time precludes fair consideration of the relevant issues, that judge will simply order a new trial.

## III.

The more difficult issues occur in the second appeal, which followed the hearing on remand. At that hearing, Judge George W. Bowling, who had been the trial judge, implicitly found that a prima facie case of discrimination had been established, and directed the parties to address the sufficiency of the State's explanation for the strikes exercised against black jurors. Both prosecutors, both defense attorneys, and two of the four black jurors who had been

---

4. According to their later testimony, the motives of the prosecutors for spreading these reasons upon the record were mixed. The State's Attorney, Mr. Sengstack, stated that on the preceding evening he had read something about a pending or decided case that led him to believe that it might be prudent to have the record reflect the State's reasons. The Deputy State's Attorney, Mr. Clagett, stated that he was responding to an off-the-record accusation made to him the preceding evening by one of the defense attorneys, regarding the State's intentional striking of black jurors.

excused by the State's challenges, testified. After consideration of this testimony and counsel's argument, Judge Bowling held that the State had successfully shouldered the burden of demonstrating that in each instance the exercise of a peremptory challenge against a black juror was for a legitimate and racially neutral reason. On appeal, Chew concedes that as to Deborah Stovall, who was challenged when considered for the position of first alternate juror, there existed sufficient racially neutral reasons to explain the challenge by the State.[5] Chew maintains, however, that the findings of the trial judge with respect to jurors Alonzo Carroll, Jane Hawkins, and Emma Marshall were clearly erroneous.

Alonzo Carroll was the first black juror struck by the State. When, on the third day of trial, Deputy State's Attorney Clagett volunteered the State's reasons for the exercise of that challenge, he said that Carroll, a nineteen year old laborer, was struck because "the occupational background that he has is similar to the defendant in this case, and in general, we thought he would be sympathetic with the defendant." At the hearing after remand, Clagett testified that:

> I wanted Mr. Carroll struck because he was 19 years of age, very serious case, I think we agreed we preferred older as opposed to younger. He was a laborer, similar occupation as Mr. Chew as I knew Mr. Chew prior to this case. I think Michael worked as a laborer to the best of my knowledge. And that is why I struck Mr. Carroll.

Clagett further explained on cross-examination that in serious criminal cases, and particularly in capital cases, he had

---

5. During the voir dire, Ms. Stovall stated that she was opposed to the death penalty. At one point, she said she would always vote against capital punishment. Upon further questioning, she said she did not know whether she could vote for a death sentence, but believed she could follow the law as it related to sentencing. For a recent discussion of the exercise of a peremptory challenge under similar circumstances, *see Ross v. Oklahoma,* 487 U.S. ——, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988).

a strong preference for jurors older than someone in their teens or early twenties. State's Attorney Sengstack testified that his desire to strike Carroll was based solely upon the juror's age. He said, "I feel strongly that young jurors should not sit on felony cases, especially murder cases." Judge Bowling concluded that the State's explanation for striking Carroll was satisfactory. He said:

> I certainly can understand a State's Attorney, having been one for some 8 years, concluding that in a case of this kind he might want a more mature juror than one who is 19 years of age. That to me does not seem to be an unreasonable reason for striking a juror. I know that persons 18 and above are qualified to serve as jurors, but ... the prosecutor is not entitled to strike persons for reasons that are racially motivated but I think that a reason given is not such in the Court's opinion that seems unreasonable in the case of Mr. Carroll.

The youngest juror that served on Chew's jury was twenty-six years of age.

Jane Hawkins was the second black juror against whom the State exercised a peremptory challenge. The initial reasons given by the deputy state's attorney were that the juror "appeared to be very nervous and fidgety. That was not the type of individual we wanted for a juror. Also her estranged husband had a fairly serious criminal record ... use of a handgun and that sort of thing." Moreover, Clagett said, there was some indication "that she may be a relative or relationship of Buck Wills." The prosecutor explained that Buck Wills was the proprietor of a bar known as "Birdland," and that there might be testimony concerning Birdland because one of the statements taken from Chew indicated that Chew claimed to have been "shooting craps" in that bar the night the victim disappeared. Defense counsel immediately responded that "Mrs. Hawkins was not at all fidgety or nervous that I see."

At the hearing after remand, Jane Hawkins testified. Following her testimony, Deputy State's Attorney Clagett said:

And Mrs. Hawkins, to be quite honest with you I am not sure she appeared any more fidgety to me, maybe in eye of the beholder. I am not sure she appeared any more fidgety that day than she did up here testifying. She appears to be, she said active, nervous, fidgety what have you.

Clagett conceded there was no evidence that the juror was related to Buck Wills, and said the "relationship" to which he earlier referred was that Ms. Hawkins had taught Buck Wills' children in school. He said he "didn't want anyone on that panel that knew of the establishment or Mr. Wills."

State's Attorney Sengstack testified that he concurred in the exercise of a peremptory challenge against Jane Hawkins because her husband had been convicted of an offense involving a dangerous weapon; because she knew the Wills' children; and because he had a "gut reaction" to her looks, and "didn't care for her looks." Defense Attorney Wood testified that he paid close attention to the black jurors, and he did not notice Ms. Hawkins being nervous or fidgety. The jury list disclosed that Ms. Hawkins was thirty-four years of age, had a college education, and was employed as a school principal. During voir dire, she had informed the court that she formerly taught Buck Wills' children in school, and that her husband, from whom she had then been separated for a year, had been previously convicted for "use of a handgun" and he was then "on work release." Ms. Hawkins testified that to the best of her knowledge she had not been nervous or "fidgety" during the jury selection process.

The third black juror in question was Emma Marshall, who initially had been seated in the jury box, but then was struck by the State. As to her, Deputy State's Attorney Clagett first offered this explanation:

We did have second thoughts after and struck her. She was our fourth strike, third black juror that was struck, and the reason she was struck other than basically—and I am sure defense strikes people for this reason too—she just showed an utter contempt for the whole proceeding.

She never cracked a smile, no facial expression during the whole time and Mr. Sengstack and I decided that we did not want her serving on the jury.

Chew's counsel took immediate exception to the State's proffered reason, stating:

In response to that, your Honor, I would like to note that Mrs. Hawkins was not at all fidgety or nervous that I saw. Secondly, Mrs. Marshall did not exhibit any utter contempt for the proceedings here at all. I am pretty surprised by that remark. She appeared to me like other jurors seated in the jury box. I didn't see any other jurors smiling as well. It is a serious proceeding, and because Mrs. Marshall was not smiling I didn't view that as utter contempt. I wouldn't be able to agree that she was not smiling. I wasn't watching her all the time, but I take strong exception to that observation.

At the hearing after remand, Deputy State's Attorney Clagett testified in answer to State's Attorney Sengstack's question:

Something happened in my own mind—trying to remember—when it became obvious she was going to be sworn I guess I felt that what Mrs. Marshall expressed here today, given a choice she would much rather be somewhere else other than sitting in that box. I guess it was the look of her face that came when it appeared imminent that she was going to be [sworn].[6] I don't know how I described it in the, at the time of the trial, but she just did not appear, seemed like she wanted to be anywhere else on earth other than in that jury box during this trial and maybe utter contempt for the whole proceeding I said was not a good phrase but she did not want to be there. That was quite obvious to me. That is when I think I said to you, look at Mrs. Marshall and you agreed and we struck Mrs. Marshall.

---

**6.** The transcript reflects "struck" at this point. From the context of the proceeding, and from other testimony, it is apparent to us that what the witness meant to say was "sworn."

When asked how long the period of deliberation or review of the potential juror had been, Clagett replied:

> I don't know. A few seconds. I punched you and said look at Mrs. Marshall. And whatever I might have said at the time and you said I kind of agree, let's strike her. So we struck her.

When asked on cross-examination whether Ms. Marshall had "show[n] any contempt back when the jury process was being conducted," the prosecutor answered "No."

State's Attorney Sengstack testified that:

> With respect to her appearance in the jury box, my recollection is that she was expressionless, that she was motionless, I quite frankly don't recall a person in the jury box who ever moved as little as she did. She was completely stone faced. It was my impression that she was going to be an unfavorable juror for someone and I didn't want it to be us so we agreed she should be stricken.

Sengstack agreed with his deputy that there "was absolutely nothing wrong with her prior to her entry into the box."

Defense Attorney Wood testified that he did not observe anything unusual about the appearance or demeanor of Ms. Marshall, and that she did not appear to him to express any kind of animosity or hostility toward the proceedings. Emma Marshall testified that she had felt no hostility toward anyone involved in the proceedings, but that she was not being paid for the time lost from work for jury service, and if she had been given a choice, she would have preferred not to serve. She added that she would have served if selected because she considered that her "patriotic duty."

■ We agree with the trial judge's determination that a prima facie showing of racial discrimination was made in this case. We must, therefore, examine carefully each instance in which a black juror was struck by the State because, as we made clear in *Tolbert v. State,* 315 Md. 13, 22, 553 A.2d 228 (1989) and in *Stanley, supra,* 313 Md. at

92, 542 A.2d 1267, when the prima facie showing has been made, "[a] new trial will be required if the State cannot produce satisfactory nondiscriminatory reasons for *every* peremptory challenge exercised to exclude a black juror." As the Court of Special Appeals pointed out in its opinion in this case, *Chew v. State, supra,* 71 Md.App. at 701, 527 A.2d 332, and even more recently in *Simpkins v. State,* 79 Md.App. 687, 694, 558 A.2d 816 (1989), an appellate court will give great deference to the first level findings of fact made by a trial judge, but having done so, will make an independent constitutional appraisal concerning the existence of neutral, non-racial reasons for the striking of a juror. *See also Batson, supra,* 476 U.S. at 98, n. 21, 106 S.Ct. at 1724, n. 21; *Tolbert, supra,* 315 Md. at 24, 553 A.2d 228.

Although the State's reasons for each strike must be considered, that examination does not take place in a vacuum. Rather, as we pointed out in *Stanley, supra,* 313 Md. at 77, 542 A.2d 1267, each strike must be examined in light of the circumstances under which it was exercised, including an examination of the explanations offered for other peremptory strikes.

In the case of juror Carroll, the State was on extremely thin ice in suggesting that because a juror's occupation was shown as a laborer, and that was believed to be the general employment background of the defendant, there was reason to strike the juror. On the other hand, as Judge Bowling acknowledged, the age of a juror is a reason that historically has been employed by both prosecutors and defense counsel in the exercise of peremptory challenges. For reasons that more fully appear hereafter, we need not decide whether that explanation was constitutionally sufficient under the facts of this case.

The challenge of juror Jane Hawkins presents even greater difficulties. The prosecutor's allegation that the juror appeared nervous and fidgety was immediately challenged by Chew's attorney, who said he observed no such demean-

or.  The State's allegation of nervousness was tempered when testimony on the subject was given at the hearing after remand, but defense counsel's denial remained adamant.  The original contention that the juror might be a relative of Buck Wills shrank to the assertion that there was a "relationship" because Ms. Hawkins had taught the Wills' children.  There remained the explanation that the juror's husband had been convicted of "use of a handgun" and was on work release at the time of Chew's trial.  The potential impact of that information was somewhat diluted by the fact that the juror had been separated from her husband for a year at the time of the voir dire.

Unfortunately, the trial judge did not come to grips with the precise question presented by this set of facts, because to some extent he misconstrued the evidence.  His findings as to juror Hawkins were as follows:

> Mrs. Hawkins—Mr. Roberts is saying well she was separated from her husband.  I don't know that there is any evidence to show that at the time she was being interviewed that anything developed which showed in fact she and her husband were coming to a parting of the ways and I can not conclude that the wife of an individual who had been placed, who had been found guilty or whose husband had been found guilty of assault with intent to murder and who was serving on work release at the time, sentenced on work release at the time might have some feeling about the criminal justice system that could be derogatory and I can't say that the striking of that juror was unreasonable.

As in the case of the first juror, we need not resolve the thorny questions raised by this state of affairs, because we find that in the case of the third juror it is abundantly clear that the trial judge's ruling on the acceptability of the prosecutors' reason for the strike cannot be accepted.

As we have noted, the sole reason advanced by the State for striking Emma Marshall was that she appeared immo-

bile,[7] "stone faced," and unsmiling as she sat in the jury box, so that it appeared to the prosecutors that she preferred to be anywhere else but on that jury. Again, this allegation, which began with the stronger characterization that the juror appeared to harbor contempt for the proceedings, was immediately challenged by Chew's attorney, who told the trial judge at the time of trial, and later testified at the hearing, that he had observed the juror and yet saw no such demeanor. Neither prosecutor alleged that the conduct of Emma Marshall was out of the ordinary during the earlier voir dire. It was, they said, their brief observation of her as she sat in the box waiting to be sworn, that convinced them a challenge should be made.

We do not gainsay the State's contention that the appearance and demeanor of a prospective juror has, long before *Batson*, been the actual basis for racially neutral peremptory challenges by attorneys in both civil and criminal cases. Nor do we suggest that under appropriate circumstances we would refuse to accept the finding of a trial judge that this was an acceptable reason for the exercise of what might otherwise appear to be a racially discriminatory challenge. We point out, however, that this may be a difficult explanation to sustain. The State has the burden of showing that 1) a reason other than the race of the juror did exist, and 2) the reason has some reasonable nexus to the case and was in fact the motivating factor in the exercise of the challenge. Quite often, the first part of this proof involves no contested issue of fact. If the challenge involves the age, occupation, criminal history, or the like of the juror, the record clearly reflects the predicate fact. The trial judge need only determine whether that reason qualifies as a racially neutral explanation. In this case, however, the prosecutor was advancing as a fact

---

7. Given the concern of the prosecutors that this juror never moved as she sat in the box, and their concern that juror Hawkins appeared nervous and fidgety, one is moved to speculate about the degree of mobility on the part of a juror that would have been acceptable.

something that was not a matter of record, and the existence of which was continuously and strenuously contested by the defendant. Before a trial judge can determine that a ground is racially neutral, he must be convinced that it exists in fact. Here, the judge made no such finding. Indeed, apparently overlooking the immediate protestation spread upon the record by defense counsel at the time the prosecution first volunteered the explanation, and apparently overlooking as well the testimony of defense counsel at the hearing after remand, the trial judge found there was no evidence to contradict the existence of juror demeanor advanced by the prosecutor. The trial judge said:

> The only striking that causes some problem is the striking of Mrs. Marshall and to be perfectly honest with you I can not find any evidence that would show that Mr. Clagett's impression, which he called to the attention of Mr. Sengstack, was improper and that there was any evidence to show that what he saw was not happening and in the absence of that I have no basis for concluding that Mrs. Marshall was actually struck from the panel because of racial reasons.

Had the trial judge evaluated all of the evidence bearing on the issue, and had he found, perhaps bolstered by his own recollection of the juror's demeanor, that the predicate fact had been established, we would have a different issue presented. He did not. We do not wish to appear critical of the trial judge's efforts in this matter. He was faced with the difficult process of attempting to reconstruct a scene long since past. He was operating in largely uncharted procedural waters, and the State's explanation for the exercise of the peremptory challenge to Ms. Marshall generated difficult problems concerning nonverbal communications of a juror.[8] We earlier discussed our recognition that

---

8. The problem of assessing the contention of juror demeanor as the impetus for a peremptory challenge will be somewhat ameliorated in future cases because the *Batson* inquiry will necessarily be made immediately. Trial judges will obviously be especially attentive to the class of jurors that may be involved in a *Batson* challenge. Still,

a limited remand for purposes of a hearing provides only a reasonable chance that reconstruction may be accomplished to the point of providing a definitive answer. Here, it did not, and the appropriate resolution at this point is to direct that the judgment of conviction be vacated and the case remanded for a new trial.

■ In remanding for a new trial, we make it clear that the retrial shall be on the question of guilt or innocence. The defendant is not to be subjected to a new trial on the issue of capital punishment. Notwithstanding the problem we have identified in the selection of the jury, that jury's verdict that capital punishment is not an appropriate sentence in this case will stand. *Bullington v. Missouri,* 451 U.S. 430, 445–46, 101 S.Ct. 1852, 1861–62, 68 L.Ed.2d 270 (1981).

IN NO. 146, JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED. IN NO. 166, JUDGMENT OF THE CIRCUIT COURT FOR CHARLES COUNTY REVERSED AND CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE THE JUDGMENT OF CONVICTION AND PROVIDE A NEW TRIAL CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY CALVERT COUNTY, MARYLAND.

---

because the burden of establishing the existence of the predicate fact will always be upon the State when it is attempting to rebut a prima facie case of racial discrimination, the trial judge may well reject that which he or she has not observed.