857 P.2d 1249

STATE of Arizona, Appellee,

v.

Robert Charles CRUZ, Appellant.

No. CR–89–0093–AP.

Supreme Court of Arizona,
En Banc.

July 29, 1993.

**396**

Richard M. Romley, Maricopa County Atty. by Gerald R. Grant, Deputy County Atty., Phoenix, for appellee.

McNally and Robinson by Kevin McNally, Gail Robinson, Frankfort, KY, and Denise I. Young, Arizona Capital Representation Project, Tempe, for appellant.

## OPINION

MOELLER, Vice Chief Justice.

### STATEMENT OF THE CASE

On New Year's Eve, 1980, three men broke into the Redmond residence in Phoenix and murdered Patrick Redmond and his mother-in-law, Helen Phelps.[1] They also attempted to murder Patrick Redmond's wife, Marilyn, but she survived. Ultimately, the defendant, Robert Charles Cruz, who was not one of the three men who entered the Redmond residence, was charged with two murders, the attempted murder, and the related crimes of conspiracy to murder, armed robbery, kidnapping, and burglary.[2] At his first trial, Cruz was convicted of all charges. On appeal, those convictions were reversed. *State v. Cruz I,* 137 Ariz. 541, 672 P.2d 470 (1983). Cruz's second and third trials both resulted in hung juries.

At defendant's fourth trial, he was again convicted of all charges. He was sentenced to death on the murder counts and to terms of imprisonment on the other counts. Appeal to this court is required and automatic on the death penalties. *See* Ariz.R.Crim.P. 31.2(b). Defendant timely appealed the other convictions and sentences. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. § 13–4031. Because constitutional error, properly raised and preserved, occurred during the jury selection process, we reverse and remand for a new trial.

### FACTS

A *Batson*[3] issue is dispositive. We therefore confine our statement of facts to those relevant to that issue. Because of widespread publicity this case had received and the anticipated length of the trial, the trial court had 100 prospective jurors fill out written questionnaires. The plan was to qualify 36 prospective jurors so that 16 jurors, including four alternates, would be available to hear the case after each side exercised its authorized 10 peremptory challenges. After reviewing the completed questionnaires and consulting with counsel, the trial court excused 60 of the prospective jurors for cause. Of the 40 remaining in the pool, three were Hispanic. The defendant Cruz is Hispanic. Some, but not all, of the 40 remaining jurors were questioned individually. Those questioned included the three Hispanics.

After obtaining a panel of qualified jurors, the parties exercised their strikes. The defendant exercised all 10 of his; the state exercised only five of its 10. Two of the three Hispanics on the panel were among the five jurors removed by the state. Because the state did not exercise the balance of its strikes, the third and last Hispanic on the panel was not on the final panel of 16. Had the state exercised seven strikes rather than five, the remaining Hispanic would have been on the final panel unless, of course, the state's sixth or seventh strike was directed at him.

---

1. Because of massive, sustained publicity generated by the murders and related cases, no purpose would now be served by withholding the identity of the victims.

2. The state's theory was that defendant, in order to take over Patrick Redmond's business, conspired to have Redmond killed and hired professional killers to do the job.

3. *Batson v. Kentucky,* 476 U.S. 79, 86, 106 S.Ct. 1712, 1717, 90 L.Ed.2d 69 (1986).

When the state completed its strikes, Cruz immediately objected, claiming that the state's use of its strikes violated *Batson*, 476 U.S. at 86, 106 S.Ct. at 1717. The trial judge required the state to explain its use of its peremptories. The prosecutor offered the following explanation:

MR. TUROFF [The Prosecutor]: Yes. I—C.S. [Hispanic Juror No. 1], my notes, she was one of the jurors that was brought in for singular confrontation by the Court and counsel. My notes say she's weak, poor contact with me, felt she would be led, and I struc[k] her for those reasons.

And I struc[k] another juror by the name of M.L. [another panelist] for the same reason.

As I recall, H. [Hispanic Juror No. 2] was 18 years old. I don't know if he is Hispanic or what he is. He is 18 years old. He worked from 3:30 to 3:30. He said it may—he may lose his job. He didn't ask his employer whether he would or would not would have lost his job if he were to be off for eight weeks. And his wanting to be the one that may make the difference led me, along with all the others, to where I felt were negatives that led me to strike him.

At one point during the *Batson* proceedings in the trial court, defense counsel asked permission to question the prosecutor further about his strikes of the two Hispanics. However, that request was withdrawn after the trial court stated:

THE COURT: You can exam[ine] him. I don't know that he's required to answer them, but I'll let you go ahead and ask, if he chooses to answer. I [don't?] know of any procedure that requires him to furnish an answer.

At no point did the prosecutor offer any explanation of his use of only five peremptories. After confirming that R.H., the second Hispanic juror, was indeed Hispanic, the trial court ruled:

The record should reflect that as far as my determination is concerned, I'm going to make a finding the reasons stated by counsel for the state are reasons which are valid and do not go toward reasons

based on race or ethnic background and that sort of thing, and those jurors remain stricken. . . .

Thus, no Hispanics sat on the jury that heard the case. Although the record is not conclusive on the point, it suggests that no minority person sat on the final panel.

## ISSUE

Under *Batson v. Kentucky*, does the prosecution overcome a prima facie case of discriminatory use of peremptory challenges by stating a facially neutral, but wholly subjective, reason for using those challenges when the record contains nothing else to support the stated reason?

## DISCUSSION

### I. General *Batson* Procedures

*Batson* held, for the first time, that the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits the state, in a criminal prosecution, from exercising its peremptory challenges in a racially discriminatory manner. Under *Batson*, it is no longer necessary to show a pattern of discrimination in other cases as a predicate to enforcing the constitutional prohibition. *Cf. Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), *overruled by Batson*, 476 U.S. at 79, 106 S.Ct. at 1712.

Although many state and federal cases since *Batson* have extended its application, *see, e.g., State v. Superior Court*, 157 Ariz. 541, 760 P.2d 541 (1988) (white defendant can raise *Batson* challenge), *cert. denied*, 499 U.S. 982, 111 S.Ct. 1638, 113 L.Ed.2d 733 (1991); *State v. Anaya*, 170 Ariz. 436, 441, 825 P.2d 961, 966 (App.1991) (*Batson* applies to criminal defendant's use of peremptories), the instant case presents a classic *Batson* situation. This case is a criminal case in which the defendant, a member of a cognizable racial minority, *see State v. Jordan*, 171 Ariz. 62, 66, 828 P.2d 786, 790 (App.1992) (*Batson* applies to all ethnic and racial groups); *State v. Boston*, 170 Ariz. 315, 823 P.2d 1323 (App.1991) (finding *Batson* violation when state struck an Hispanic

woman), challenges the prosecution's peremptory challenges against members of the same cognizable racial minority. We therefore analyze the issue under classic *Batson* considerations.

Throughout the proceedings in the trial court and here, the state tacitly conceded that defendant presented a prima facie case of discrimination with respect to the two excused Hispanic jurors. At oral argument, this tacit admission was made express. With respect to those two jurors, therefore, we may move directly to the second step in the *Batson* analysis.

■ Under *Batson*, when a defendant makes a prima facie case that the state has exercised its peremptories in a racially discriminatory manner, the burden shifts to the prosecutor to articulate a race-neutral, case-related reason for the strike. *Batson. See also Hernandez v. New York*, — U.S. —, —, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). The neutral reason need not rise to the level of a challenge for cause. *Batson*, 476 U.S. at 97–98, 106 S.Ct. at 1723.

■ In the third step of the *Batson* analysis, the trial court must determine whether the defendant has carried the ultimate burden of showing that the state's strikes were taken for discriminatory reasons. *Hernandez*, — U.S. at —, 111 S.Ct. at 1866, 1868. A trial court's finding on this issue is a finding of fact, *see State v. Reyes*, 163 Ariz. 488, 490, 788 P.2d 1239, 1241 (App.1989), and, on appellate review, will be reversed only if clearly erroneous. *Hernandez*, — U.S. at —, 111 S.Ct. at 1871.

Before applying these *Batson* principles to this particular case, we readily acknowledge that *Batson* has been a rapidly evolving constitutional construct and that, since the time of the trial in this case, many courts have discussed and refined *Batson*, giving us the benefit of guidance unavailable to the trial court at the time of trial in this case.

## II. Untimeliness of One *Batson* Issue

We first note a *Batson* issue that we will not consider in this appeal. In post-trial motions, defendant sought to bolster his *Batson* arguments by presenting, for the first time, evidence of occurrences at his earlier trials. Basically, defendant contended that the prosecution had exercised its strikes in the first trial in a racially discriminatory fashion. That first trial led to the convictions that were reversed in *Cruz I* on grounds unrelated to jury selection. The defendant then argued, essentially, that because minorities on the second and third juries, which hung, had been among those favoring acquittal, the prosecution was motivated to exercise its strikes discriminatorily in this, the fourth trial. Defendant reurges and expands on these post-trial arguments in this appeal.

■ We have previously held that *Batson* challenges must be made before the end of. the jury selection process or they will not be considered on appeal. *State v. Harris*, 157 Ariz. 35, 754 P.2d 1139 (1988). We believe that this rule should also be applied to the untimely presentation of evidence to support *Batson* arguments otherwise properly raised. This limitation on *Batson* rights passes constitutional muster, *see Allen v. Hardy*, 478 U.S. 255, 259, 106 S.Ct. 2878, 2881, 92 L.Ed.2d 199 (1986) (new rule doesn't have fundamental impact warranting retroactive application); *Virgin Islands v. Forte*, 806 F.2d 73, 76–77 (3d Cir.1986) (not fundamental error; waived if not timely raised), and we adhere to it.

## III. *Batson* Issues Properly Presented to This Court

Defendant makes three *Batson* arguments that were timely asserted and properly preserved for appeal. First, he argues that the strike of the first Hispanic, C.S., violated *Batson*. Second, he argues that the strike of the second Hispanic, R.H., violated *Batson*. (The state advanced different arguments in support of its strike of R.H. than it did for C.S.) Third, he argues that the state's failure to use all its peremptories violated *Batson*, because that resulted in the third and last Hispanic on the

panel being excluded from the final panel. In light of our disposition of the first of these arguments, we do not reach the other two.

## IV. *Batson* As Applied to Juror C.S.

We restate the state's proffered reason for striking juror C.S.:

MR. TUROFF: Yes. I—C.S. [Hispanic Juror No. 1], my notes, she was one of the jurors that was brought in for singular confrontation by the Court and counsel. My notes says she's weak, poor contact with me, felt she would be led, and I struc[k] her for those reasons.

And I struc[k] another juror by the name of M.L. [another panelist] for the same reason. W.M.L. [full name of panelist].

Appendix A is a transcript of the individual voir dire of juror C.S. and relates primarily to pretrial publicity. This transcript reveals no objective confirmation of the prosecutor's subjective conclusions concerning her weakness, leadability, or lack of contact with the prosecutor. The prosecutor also stated that he had excluded a non-Hispanic juror, W.M.L., for reasons similar to those advanced in connection with C.S. We have examined the transcript of the voir dire questioning of W.M.L., Appendix B. Again, it is evident that the words themselves lend no objective support for the prosecutor's impressions of weakness, leadability, or lack of contact.

Obviously, if we hold that a party's assertion of a wholly subjective impression of a juror's perceived qualities, without more, overcomes a prima facie showing of discrimination, *Batson* could easily and quickly become a dead letter. We do not believe the United States Supreme Court issued the landmark *Batson* opinion without intending that state courts vigorously protect it. Yet, application of *Batson* when a facially neutral explanation is offered has proven to be exceptionally difficult. *Compare Reyes*, 163 Ariz. 488, 788 P.2d 1239 (upholding strike of Hispanic woman who appeared "overwhelmed"); *United States v. Uwaezhoke*, 995 F.2d 388 (3d Cir.1993) (upholding strike of black woman who was

a postal employee), *with Buck v. Commonwealth*, 14 Va.App. 10, 415 S.E.2d 229 (1992) (reversing conviction when black juror struck because of her age and lack of children); *Smith v. State*, 790 S.W.2d 794 (Tx.App.1990) (reversing conviction when black juror struck because she stared at prosecutor throughout voir dire).

We agree with this statement by the Texas Court of Appeals:

Although we are unwilling to say that a juror's demeanor cannot ever be a racially neutral motive for a prosecutor's peremptory challenge, the protection of the constitutional guarantees that *Batson* recognizes requires the court to scrutinize such elusive, intangible, and easily contrived explanations with a healthy skepticism.

*Daniels v. State*, 768 S.W.2d 314, 317 (Tex. App.1988); *see also State v. Tubbs*, 155 Ariz. 533, 537, 747 P.2d 1232, 1236 (App. 1987); *Joiner v. State*, 618 So.2d 174, 175 (Fla.1993).

Balancing the competing considerations, we conclude that our court of appeals stated the correct rule in *State v. Reyes*, 163 Ariz. 488, 788 P.2d 1239 (App. 1989). That court concluded, and we agree, that where, as here, the state offers a facially neutral, but wholly subjective, reason for a peremptory strike, it must be coupled with some form of objective verification before it can overcome the prima facie showing of discrimination. *Id.* at 490, 788 P.2d at 1241. Such verification could come from the words of the prospective juror but, of course, it did not in this case. The objective verification could also be accomplished by a prosecutor's statement concerning the facts upon which the subjective conclusion is based. This would assist the trial court in determining whether the proffered reason was truly neutral or merely pretextual. In appropriate cases, the objective verification could be the trial court's own observations, made on the record, which might show that the prosecutor's subjective conclusion was an appropriate reason for a facially neutral peremptory challenge. Our conclusion that indepen-

dent verification is required in cases such as this is supported by other authorities as well as by Arizona's own *Reyes* case. *See, e.g., Smith*, 790 S.W.2d at 796; *Hill v. State*, 547 So.2d 175, 176 (Fla.App.1989); *Chew v. State*, 317 Md. 233, 562 A.2d 1270, 1277 (1989).

■ In the instant case, the record contains no independent verification from any source to support, in any manner, the prosecutor's subjective feelings about juror C.S. On the facts of this case, therefore, we are constrained to hold that the state has not established a race-neutral, case-related explanation for striking juror C.S. under *Batson*. *See Daniels*, 768 S.W.2d at 318. The trial judge's finding to the contrary cannot be sustained. In the face of a prima facie showing of discrimination, which admittedly exists here, we will not read *Batson* to permit peremptory strikes of minorities by any party based solely on an unverified subjective impression, lest *Batson*'s guarantee of equal protection become nothing more than empty words. *See Daniels*, 768 S.W.2d at 317.

■ Having concluded that error occurred in sustaining the challenge to juror C.S., we do not examine the adequacy of the separate and different reasons advanced for excluding juror R.H., nor do we reach the issue of whether a *Batson* violation occurred because the state exercised only some of its allotted peremptory challenges. Exclusion of a single juror in violation of *Batson* requires a new trial. *Buck*, 415 S.E.2d at 232; *People v. Brown*, 597 N.Y.S.2d 434, 435 (App.Div.1993); *Bush v. State*, 615 So.2d 137, 140 (Ala.Crim.App. 1992); *Joiner*, 618 So.2d at 176.

## V. Size of Defendant's Brief

■ We address this issue because it has arisen recently in other capital cases, and we wish to provide guidance concerning it. In this case, after receiving numerous extensions of the filing deadline, defendant filed a request to submit an oversized brief. This request was filed four days before the opening brief was finally due and with the request was tendered a proposed 275–page brief, along with a 40–page appendix. In-stead of granting that request, we permitted a 150–page opening brief and granted defendant yet another extension of time within which to edit and file the brief. Even under the new, liberalized rule applicable to death penalty appeals, the 150 pages is nearly twice the length the court permits. *See* Ariz.R.Crim.P. 31.13(f) (allowing 80 pages on opening brief for defendants in capital cases). Defendant then filed a "brief" of 150 pages, but included, in addition, 41 pages of single-spaced "End Notes" containing most of the material originally contained in the 275–page proposed brief and an additional 60–page appendix.

In short, by manipulating the brief's format, the defendant circumvented the court's order. The same tactic was recently condemned by us in *State v. Atwood* in which we addressed the subject of oversized briefs and effective representation in capital cases. *See Atwood*, 171 Ariz. 576, 658–59, 832 P.2d 593, 675–76 (1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993). We affirm the statements we made in *Atwood* and commend them to all counsel who represent parties in capital cases.

Cruz now argues that our order limiting his opening brief to 150 pages denied him due process and equal protection of the laws under the United States and Arizona Constitutions. He argues that his due process rights were violated because he could not effectively raise his arguments in an opening brief limited to 150 pages. Defendant further argues that his right to equal protection was violated because he received fewer pages in which to argue than did the defendant in *State v. Bible*, Sup.Ct. No. CR–90–0167–AP (orders dated January 21, 1992 and June 2, 1992). The short answer to both these contentions is that defendant could not have been prejudiced by the court's page limit because he didn't comply with it in any event.

■ Had he complied, his argument still would not prevail. We have considered and rejected the due process argument previously. *See State v. Amaya–*

*Ruiz,* 166 Ariz. 152, 182–83, 800 P.2d 1260, 1290–91 (1990), *cert. denied,* — U.S. —, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991). As to the equal protection argument, we probably permitted excessively long briefs in *Bible* as well as in this case. *Bible* involved extremely complicated DNA issues, which were being presented to this court for the first time. The instant case presents no such novel issue.

Recent amendments to our rules will harmonize the brief size in all capital cases. We gave a great deal of thought before adopting our new rule permitting double-size briefs in capital cases. *See* Ariz. R.Crim.P. 31.13(f). It is a reasonable rule and counsel should heed it. The great majority of counsel in death penalty cases, including some of the most effective, have had no problem with either the old or new page limitations. We are, of course, aware of counsel's need to preserve issues on appeal for further review by federal courts in capital cases, and we are quite aware of our responsibilities, and those of counsel, in capital litigation. In the absence of significant changes in the law, however, repeated rehashing of issues already decided by this court serves only to detract from meritorious issues. Absent developments in the law warranting a re-examination of issues already decided, defendants, if they feel that an issue needs to be raised to be preserved, should discuss them only briefly.

Choosing the most effective arguments for presentation on appeal is the hallmark of good appellate litigation, *see Jones v. Barnes,* 463 U.S. 745, 752–53, 103 S.Ct. 3308, 3313, 77 L.Ed.2d 987 (1983), and "[a page] limitation induces the advocate to write tight prose, which helps his client's cause." *Morgan v. South Bend Community School Corp.,* 797 F.2d 471, 480 (7th Cir.1986); *see also Amaya–Ruiz,* 166 Ariz. at 182–83, 800 P.2d at 1290–91 (limiting capital defendant's brief to 120 pages); *Tompkins v. State,* 774 S.W.2d 195, 218–19 (Tex.Crim.App.1987) (limiting capital defendant's brief to 50 pages), *aff'd on other grounds by an equally divided court,* 490 U.S. 754, 109 S.Ct. 2180, 104 L.Ed.2d 834 (1989); *State v. Brown,* 397 N.W.2d 689, 700–01 (Iowa 1986) (limiting first degree murder defendant's brief to 65 pages).

In summary, we restate and emphasize what we have earlier stated in *Atwood:*

Winnowing the record and making discriminatory choices concerning the fact or law to be emphasized are essential elements of the art of appellate advocacy. Lawyers who are unable or unwilling to exercise those skills to present the issues in a reasonably-sized brief should not be appointed to represent indigent defendants on appeal. [A] defendant's rights are more likely to be disserved by an excessively long brief than they are by an appropriately condensed one.

171 Ariz. at 658 n. 28, 832 P.2d at 675 n. 28.

## OTHER ISSUES

Many of the issues raised are unlikely to recur at a retrial. Many other issues raised are moot until and unless defendant is reconvicted and resentenced to death. If that occurs, appellate review on the new record is mandatory at that point. Accordingly, we confine this opinion to the two issues discussed and decided: the *Batson* issue and the length of brief issue.

## DISPOSITION

The convictions are reversed and this case is remanded for a new trial in accordance with this opinion.

FELDMAN, C.J., and CORCORAN, ZLAKET and MARTONE, JJ., concur.

## APPENDIX A

Q. (By the Court): You're C.S., right?

A. Uh-huh.

Q. Ms. S., did you wish to change any of the answers to the questions that you had written out in the questionnaire?

A. No.

Q. All right. Did you have any problem in reading the questionnaire, understanding the questions?

A. There was one question where I marked off where I marked the other one.

Q. Okay.

MR. BICKART: Question 15, Page 9.

THE COURT: Well, hand that to the juror.

BY THE COURT:

Q. Is that the question, ma'am?

A. Uh-huh.

Q. All right, let's go over that, then. It actually starts out on the previous page, which is Page 8. And Page 8 attempts to explain that the way a criminal case is started is by the State filing a paper, a document, and we call that an information. That's the name of the document, okay? And it explains the fact that an information has been filed is not evidence, and it's not any proof of guilt, and you are not to consider it as such. You understand that—

A. Uh-huh.

Q. —so far?

A. Yes.

Q. So the question asks, do you understand that an information, this paper that's filed, is simply a formal method of accusing a person of a crime, and that it is not evidence or proof of guilt. You understand that to be true?

A. Uh-huh. I understand that question, then.

Q. And what is your answer, then?

A. Yes, that I understand it.

Q. Okay. So in other words, there has to be evidence presented in the way of testimony and exhibits, and the State can't just rely on this information in order to prove their case; you understand that?

A. Uh-huh, yes.

Q. Okay. In your questionnaire, if I can have that back, you had indicated that you had read or heard or seen something about this case before today.

A. When I was reading the case, the name, the last name of the victim just sticks in my mind; seen it in the paper.

This was, you know, coming out in the paper.

Q. Which name was that that you remembered reading, or do you have to see the questionnaire?

A. Started with R.

Q. Redmond.

A. Redmond. That name.

Q. All right. Do you remember reading anything more about the case than just the name Redmond. Something happened?

A. No. In fact, when the guy they think who did it, or something—I don't even know—I never read his name before, you know, until the day that I was here Thursday, and the last name just came to my mind in the newspaper.

Q. All right. Now, do you feel that you would be able to set aside anything that you may have read about this case and decide the case based on evidence that is produced in the courtroom, as opposed to what you may have read about the case previously? In other words, can you just kind of set aside anything you read and not base your decision on anything that you previously read?

A. I feel that I can.

Q. Okay. The reason I ask you that is one of the questions in this questionnaire— I'll just tell you that in the questionnaire we tried to make these as clear as we can, but sometimes we don't get there.

Question No. 6 indicates, if you have read, seen or heard anything about this case, would you be able to set aside those things which you have read, seen or heard, and judge this case fairly and impartially on the evidence presented in court, and the instructions given to you by the Court at the end of the case; and you indicated that you could. Do you still feel that way?

A. Yes, I do.

THE COURT: All right. Mr. Bickart, did you have anymore questions you wanted to ask this particular prospective juror?

MR. BICKART: No.

THE COURT: Mr. Turoff?

## EXAMINATION

BY MR. TUROFF:

Q. Ms. S., you indicated you heard the name of the victim?

A. Uh-huh.

Q. Or who you thought to be a victim. Have you heard any other names of people who have—

A. Just that last name. Just that one where I read it in the paper. That was it.

Q. You formed no—I mean you have no conclusions from just reading the name in the paper?

A. No.

Q. Was this about eight years ago that you read it?

A. Well, about, yeah. I—maybe it said something that—I can't tell you what happened. It did happen in Scottsdale, that's about it. It started out with the names. I don't know who was involved in it or—just that last name that I saw. I guess that last name came up in the papers.

Q. You said a moment ago something about the guy who did it.

A. Uh-huh.

Q. What did you mean by that?

A. I—because I read where they're saying that last name.

Q. Read, you mean someone was charged?

A. Yeah, yeah. That's—what I mean, his name is not—I don't recall his name anywhere except that day when I was here Thursday.

MR. TUROFF: Okay. I have no futher [sic] questions, then.

THE COURT: Okay. Thank you, ma'am. You may be excused to go back out there.

\* \* \*

## APPENDIX B

Q. (By the Court): Good morning.

A. Good morning.

Q. You're W.M.L., right?

A. Uh-huh.

Q. Just have a seat there, ma'am. The reason I asked you to come in is because of one of the answers that you gave. In Question No. 1 you indicated that, "I wouldn't mind being a juror, but if possible I would like to attend my son's first day of kindergarten on September 6th 1988."

We'll probably be starting our trial day that day at 10:00 o'clock. I don't know where you come from. I don't really care to know. I don't need to know. But I suppose it's possible that you could at least go with your son, unless he's starting at a different time of day or something. I don't know how it would work. I wanted to let you know that that would be our tentative schedule that day. It wouldn't really be— well, it wouldn't be appropriate, I don't think, to take that day off for this type of reason.

With that in mind, ma'am, do you have any problem with serving because of that?

A. No. I arranged for my husband to be able to be there in case I was called. If not, we both could be there. So he's going to be able to be there.

Q. Okay. So I guess the rest of answers in your questionnaire would remain as you answered them?

A. Uh-huh.

THE COURT: Mr. Bickart, do you have any questions you want to ask?

MR. BICKART: I would like leave of the Court for a moment, if I might.

## EXAMINATION

BY MR. BICKART:

Q. Ma'am, how long have you lived in Arizona?

A. 21 years.

Q. 21 years?

A. Uh-huh.

MR. BICKART: I have nothing. I'll pass the juror.

THE COURT: Mr.—

MR. TUROFF: Past [sic] the juror.

THE COURT: All right, ma'am. Like I say, if you can fit that timing into your schedule, then—

MS. ML: It's fine, I've taken care of it.

THE COURT: Okay. Thank you. You may go back out in the court.