896 P.2d 830

STATE of Arizona, Appellee,

v.

Daren Lee BOLTON, Appellant.

No. CR–93–0086–AP.

Supreme Court of Arizona,
En Banc.

June 13, 1995.

Grant Woods, Atty. Gen., Phoenix by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, Eric J. Olsson, Asst. Atty. Gen., for appellee.

Susan A. Kettlewell, Pima County Public Defender, Tucson by Frank Leto, Deputy Pima County Public Defender, Brian X. Metcalf, Deputy Pima County Public Defender, for appellant.

## OPINION

MOELLER, Vice Chief Justice.

A Pima County jury convicted appellant Daren Lee Bolton (defendant) of kidnapping, burglary, and first degree felony murder for the June 27, 1986, abduction and killing of a three-year-old Tucson girl. The trial court sentenced defendant to thirty-three years for kidnapping, twenty years for burglary, and

death for first degree murder. Appeal to this court is automatic. *See* Ariz.R.Crim.P. 31.2(b); Ariz.Rev.Stat.Ann. (A.R.S.) §§ 13–4031, 13–4035 (1989). We affirm defendant's convictions and sentences.[1]

## FACTS

On the night of June 26, 1986, sometime between 11:30 p.m. and 8:30 a.m., an intruder entered the home of the three-year-old victim and her parents and abducted the child while she slept. He entered through the victim's bedroom window. The victim's body was discovered four days later in an old, inoperative, English-style taxicab that the owner had parked in a nearby storage lot. She had one stab wound in her chest. Although the body was clothed, her panties were found elsewhere in the taxicab, and the shirt that covered her stab wound was untorn, indicating that the offender may have disrobed the victim, stabbed her, and then replaced her clothing.

At both the victim's home and the abandoned taxicab, police investigators found finger and palm prints, later identified as defendant's. Also found in the taxi were the victim's fingerprints, a pizza box, cigarette butts, and a semen-stained adult sock. Blood group substances contained in the semen stains are consistent with the victim's blood chemistry, but cannot be conclusively traced to defendant. Investigators found two shoe prints near the victim's home and two more near the taxicab. Three of them appeared to match each other, but none has ever been matched to any particular shoe.

After failing to match the fingerprints found at the scenes to any known suspect, Tucson police distributed fingerprint samples to police agencies in other jurisdictions. In November 1990, police in Illinois, using a computer system not then available in Arizona, identified a fingerprint found on the victim's window screen as belonging to defendant, who was then incarcerated in Arizona State Prison on an unrelated conviction. On February 19, 1991, after further police investigation, the Pima County Grand Jury indicted defendant for the three charges for which he was convicted.

At trial, the prosecution relied largely on physical evidence, particularly fingerprints. Defendant, who testified on his own behalf, admitted that he had touched the taxicab, but claimed that he had only been there to steal parts two or three days before the date of the murder. He also admitted that he had been at the victim's window on the night of the abduction. He testified that he went to the victim's home with an accomplice to steal drugs but was scared off by the family dog. The accomplice, according to defendant, later returned alone and kidnapped the victim. Defendant claimed that he had since killed the accomplice and buried his body in an unspecified place in the desert. The jury found defendant guilty of first degree murder, kidnapping, and burglary. With respect to the murder count, the jury unanimously found defendant guilty of felony murder, and eleven of twelve jurors found the murder to have been premeditated.

At sentencing, the court found as aggravating factors that (1) defendant was an adult and the victim was a child less than fifteen years old, A.R.S. § 13–703(F)(9) (Supp.1994), and (2) defendant committed the murder in an especially heinous, cruel, or depraved manner, A.R.S. § 13–703(F)(6) (Supp.1994). The court found no mitigating factors sufficiently substantial to call for leniency.

## ISSUES PROPERLY PRESENTED FOR REVIEW

We address one issue relating to appellate procedure, thirteen trial issues, and eight sentencing issues. The issue relating to appellate procedure is:

1. The state contends that our jurisdiction is limited to the capital conviction and sentence because defendant did not file a separate notice of appeal for the noncapital convictions and sentences. We disagree because when the trial judge ordered the clerk to file a notice of appeal, he did not limit his order to the capital conviction and sentence. Because defendant may have been led

to believe that no further notice of appeal was necessary and because we must, in any event, resolve all the properly preserved issues relating to the noncapital counts in our discussion of the murder count, we accept jurisdiction over all defendant's convictions and sentences. *See State v. Detrich,* 178 Ariz. 380, 382, 873 P.2d 1302, 1304 (1994).

1. Whether our order limiting defendant's opening brief to the length specified in the Rules of Criminal Procedure violated his right to due process and effective assistance of counsel.

The trial issues are:

1. Whether the trial court should have changed the venue of defendant's trial;

2. Whether the trial court erred by "death qualifying" the jury;

3. Whether the trial court erred by dismissing four jurors for cause when they said their opposition to the death penalty would affect their deliberation;

4. Whether the state's use of peremptory strikes was unconstitutional;

5. Whether the trial court should have excluded evidence of the nature and fact of defendant's prior convictions;

6. Whether the trial court should have excluded expert testimony based on the "phenomenon" of child sex murderers who try to restore their victims to their original appearances;

7. Whether the trial court should have excluded an allegedly gruesome photograph;

8. Whether the trial court should have excluded expert testimony that it would not be surprising to find a semen stain with blood group substances consistent with the victim near the body of a sexual assault victim;

9. Whether the trial court should have declared a mistrial based on prosecutorial misconduct where the prosecutor (a) allegedly used defendant's criminal history improperly and (b) allegedly engaged in improper cross-examination;

10. Whether the trial court should have granted a directed verdict in favor of defendant;

11. Whether the trial court should have instructed the jury on lost or destroyed evidence (*Willits* instruction) because of the state's disposal of the taxicab and ten fingerprint cards;

12. Whether the trial court should have instructed the jury on termination of conspiracy;

13. Whether the trial court should have instructed the jury on unlawful imprisonment.

The sentencing issues are:

1. Whether the automatic establishment of an aggravating circumstance when an adult kills a child renders Arizona's death penalty statute unconstitutional;

2. Whether the trial court impermissibly counted or weighed the victim's age twice in finding aggravating circumstances;

3. Whether the murder was committed in a especially heinous, cruel, or depraved manner;

4. Whether the trial court failed to adequately consider and weigh all mitigating circumstances;

5. Whether the trial court should have separately found that defendant killed, intended to kill, or attempted to kill the victim (*Enmund/Tison* finding);

6. Whether the trial court should have considered the giving of a felony murder instruction as a mitigating circumstance;

7. Whether the testimony of the victim's survivors at sentencing violated defendant's constitutional rights;

8. Whether defendant's sentence of death is disproportionate.

## ISSUES WAIVED

█ In addition to the foregoing issues, defendant raises several issues that he did not raise in the trial court. On appeal we will consider a matter not raised below only if it is a matter of fundamental error. *See State v. Cornell*, 179 Ariz. 314, 328–29, 878 P.2d 1352, 1366–67 (1994); *State v. Ramirez*, 178 Ariz. 116, 126, 871 P.2d 237, 247, *cert. denied*, —— U.S. ——, 115 S.Ct. 435, 130 L.Ed.2d 347 (1994). This waiver principle applies to alleged constitutional issues, as well as to nonconstitutional issues. *State v. Bible*, 175 Ariz. 549, 572, 858 P.2d 1152, 1175 (1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994); *State v. Holder*, 155 Ariz. 83, 85, 745 P.2d 141, 143 (1987);

*State v. Magallanes,* 110 Ariz. 235, 236, 517 P.2d 505, 506 (1973).

█ In our review of this case, we have concluded that none of the waived issues presents fundamental error. *See State v. Gendron,* 168 Ariz. 153, 155, 812 P.2d 626, 628 (1991) (defining fundamental error as "error of such dimensions that it cannot be said it is possible for a defendant to have had a fair trial") (citations omitted). Therefore, we do not deal further with the issues raised for the first time on appeal, which are listed in Appendix A.

█ Defendant also raises several issues for which he offers argument insufficient for appellate review. Failure to argue a claim on appeal constitutes waiver of that claim. *State v. Carver,* 160 Ariz. 167, 175, 771 P.2d 1382, 1390 (1989); *see also* Ariz.R.Crim.P. 31.13(c)(1) (appellant's brief shall include a concise argument containing the party's contentions, reasons therefor, and necessary supporting citations). Defendant argues that the state may not now complain about his insufficient argument because the state objected to defendant's first, oversize opening brief. The state, defendant argues, caused the defendant's cursory arguments by invoking this court's eighty-page limit on opening briefs in capital cases. *See* Ariz.R.Crim.P. 31.13(f)(2). We reject defendant's argument.

Defendant could very well have complied with our rules in the first instance, and the state would have had no occasion to object. We strongly disapprove of defendant's attempt to create legal issues out of his own failure to cooperate with this court in reviewing his case. We have reviewed each of the issues, which are listed and discussed briefly in Appendix B, and have found no fundamental error. All are procedurally defaulted pursuant to Rule 31.13(c), Ariz.R.Crim.P.

Finally, defendant attached to his second opening brief thirty-one pages of additional argument contained in "appendices." The rules prohibit this practice. *See* Ariz. R.Crim.P. 31.13(c)(4) (limiting contents of appendices to pertinent authorities and extended quotations therefrom). Defendant appears to be attempting to evade our page limit by manipulating the format of his brief. We disapprove. *State v. Cruz,* 175 Ariz. 395, 400, 857 P.2d 1249, 1254 (1993); *State v. Atwood,* 171 Ariz. 576, 658–59, 832 P.2d 593, 675–76 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993); *see also Varda, Inc. v. Insurance Co. of N. Am.,* 45 F.3d 634, 640–41 (2d Cir.1995) (condemning abuse of footnotes). One "appendix" contains argument on several constitutional issues and is entitled "Capital Sentencing: Preserved Pursuant to *State v. West.*" First, defendant raised none of these issues below; thus, even if he had properly presented them in the body of his brief, we would have deemed them all waived. *Ramirez,* 178 Ariz. at 126, 871 P.2d at 247. Second, we said in *West,* "If preservation is sought to avoid issue preclusion, brevity should be employed." 176 Ariz. at 439, 862 P.2d at 199. Contrary to defendant's understanding, this statement does not license the practice of "preserving" issues in appendices. Counsel who "preserve" scores of issues which have repeatedly been decided against them should consider that if a significant change in law occurs that would benefit their clients, post-conviction relief may well be available without preclusion under Rule 32.1(g), Ariz. R.Crim.P. *See also* Ariz.R.Crim.P. 32.2(b).

We therefore strike the text contained in Appendices 3, 4, and 5 of defendant's opening brief. Argument must be in the body of the brief, and the body of the brief must comply with our very liberal page limits. The issues argued solely in appendices are all procedurally defaulted and are listed in our Appendix B. None presents fundamental error.

## DISCUSSION

### I. APPELLATE PROCEDURE

Our rules limit the length of opening briefs in capital cases to eighty pages. Ariz. R.Crim.P. 31.13(b)(1), 31.13(f). Defendant requested permission to file an opening brief exceeding the page limit and attempted to file a 175–page "brief." We denied defendant's request, rejected his oversize brief, and ordered him to file a brief in compliance with the eighty-page limit.

Defendant now claims that our order and, presumably, Rule 31.13(f) itself violate his right to assistance of counsel and deny him due process of law. He offers no legal support for this argument, and we have previously rejected it. *E.g., State v. West,* 176 Ariz. 432, 438–39, 862 P.2d 192, 198–99 (1993), *cert. denied,* — U.S. —, 114 S.Ct. 1635, 128 L.Ed.2d 358 (1994); *Cruz,* 175 Ariz. at 400–01, 857 P.2d at 1254–55. We reject it again. Reasonable limits placed on appellate briefs neither inhibit nor detract from effective appellate advocacy. As we said in *West,*

> The most effective briefs this court receives, including those in death penalty cases, *all* comply with the liberal page limitations of the rules. Only a few offices in the state chronically abuse the rules in death penalty cases. Most have no trouble providing effective representation while filing sensibly sized briefs. Barring an advance showing of the most extraordinary circumstances, this court is committed, in all future cases, to enforcing the page limitations set by the rules.

176 Ariz. at 439, 862 P.2d at 199. Defendant made no showing of extraordinary circumstances justifying deviation from the eighty-page limit.

Defendant's brief could easily have been filed within the parameters specified by the rules. Despite our prior admonitions, defendant has taken the "kitchen sink" approach. Instead of presenting a well-reasoned and legally supportable analysis of the record generated by this case, defendant has attempted in both his first and second opening briefs to include every conceivable argument. *See Atwood,* 171 Ariz. at 658–59, 832 P.2d at 675–76. Contrary to defendant's approach, winnowing of issues and argument is essential to good appellate advocacy. *West,* 176 Ariz. at 439, 862 P.2d at 199. Many of the "issues" raised have no arguable merit, and defendant gained nothing by presenting them to this court. *See Cruz,* 175 Ariz. at 401, 857 P.2d at 1255; *Atwood,* 171 Ariz. at 659, 832 P.2d at 676.

Furthermore, as we have already observed, this defendant raised numerous issues in this court that he did not raise below. "It is not the province of an appellate court to pass upon questions not acted upon by the court from which the appeal is taken." *State v. Narten,* 99 Ariz. 116, 121, 407 P.2d 81, 84 (1965), *cert. denied,* 384 U.S. 1008, 86 S.Ct. 1985, 16 L.Ed.2d 1021 (1966). Defendant waived these issues and is precluded from raising them on appeal. If trial counsel fell below acceptable standards by failing to raise a critical issue, the remedy lies not in this court on direct appeal, but in a Rule 32 proceeding. *Atwood,* 171 Ariz. at 599, 832 P.2d at 616. A Rule 32 proceeding is available in all criminal cases and is mandatory whenever we affirm a death sentence. Ariz. R.Crim.P. 32.4(a).

We categorically reject defendant's claim that our rules on brief length denied him due process when he has wasted many of his pages on precluded issues. In addition to precluded issues, defendant raised many issues which have repeatedly been rejected in recent decisions. As we have already noted, if this court or a federal court changes the law in a way that would probably benefit defendant, he can claim the benefit of the new rule without preclusion. *See* Ariz. R.Crim.P. 32.1(g), 32.2(b). Thus, defendant simply does not need to clutter his briefs in the name of "issue preservation." There was no denial of due process.

## II. TRIAL ISSUES

### 1. Change of Venue

The abduction and murder of the victim were widely reported in the local press. Press coverage was also heavy four years later when police identified defendant as a suspect. Because of this pretrial publicity, defendant argues that the trial court should have granted his motion for change of venue. The state contends that defendant has waived this argument in large part because the argument in the trial court related to the *amount* of pretrial publicity whereas, on appeal, defendant urges that the *nature* of the publicity mandated a change of venue. From our review of the record, we conclude that defendant has not waived the venue issue. On its merits, we reject it.

## (a) Presumed Prejudice

■ Defendant argues that the press coverage had such an impact on the community that prejudice requiring a change of venue should be presumed. Ordinarily, juror exposure to reports about an offense does not itself raise a presumption that the offender was denied a fair trial. *Bible,* 175 Ariz. at 563, 858 P.2d at 1166; *see Murphy v. Florida,* 421 U.S. 794, 799–800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975). "If, however, a defendant can show pretrial publicity so outrageous that it promises to turn the trial into a mockery of justice or a mere formality, prejudice will be presumed without examining the publicity's actual influence on the jury." *Bible,* 175 Ariz. at 563, 858 P.2d at 1166; *see Murphy,* 421 U.S. at 799, 95 S.Ct. at 2036; *Atwood,* 171 Ariz. at 631, 832 P.2d at 648.

■ To presume prejudice, a court must find "that the publicity was so unfair, so prejudicial, and so pervasive that [the court] cannot give any credibility to the jurors' answers during voir dire." *Bible,* 175 Ariz. at 565, 858 P.2d at 1168. In other words, "If defendant could demonstrate that media coverage was so extensive or outrageous that it permeated the proceedings or created a 'carnival-like' atmosphere, [this court] would presume prejudice." *Atwood,* 171 Ariz. at 631, 832 P.2d at 648 (citing *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965)).

■ We cannot presume prejudice in this case. The media coverage was extensive at the time of the abduction and at the time defendant was charged. The record, however, does not indicate that the media behavior was of the pervasive or outrageous nature that typically would require a court to presume prejudice. All of the reports regarding the incident were factually based, and much of the information reported was repetitive. *See Bible,* 175 Ariz. at 564–65, 858 P.2d at 1167–68.

Furthermore, the press coverage of the victim's death and defendant's emergence as a suspect was neither disruptive to the court proceedings nor suggestive of defendant's guilt or innocence. This alone distinguishes defendant's case from the Supreme Court cases that have guided us on this issue:

> Prejudice was presumed in the circumstances under which the trials in *Rideau, Estes,* and *Sheppard* were held. In those cases the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings. In *Rideau* the defendant had "confessed" under police interrogation.... A 20–minute film of his confession was broadcast three times by a television station in the community where the crime and trial took place....
>
> The trial in *Estes* had been conducted in a circus atmosphere, due in large part to the intrusions of the press, which was allowed to sit within the bar of the court and to overrun it with television equipment. Similarly, *Sheppard* arose from a trial infected not only by a background of extremely inflammatory publicity but also by a courthouse given over to accommodate the public appetite for carnival.

*Murphy,* 421 U.S. at 798–99, 95 S.Ct. at 2035–36.

Here, most of the media coverage that defendant claims deprived him of a fair trial occurred at the time the crime was committed—more than six years before the trial. And because he was not a suspect until four years after the murder, none of those reports mentioned him by name. Defendant makes no complaint of disruption or unfair publicity during the trial. Whatever prejudicial effect the news reports contemporaneous to the crime might have had on defendant's trial was so attenuated by the passage of time that it could not have rendered defendant's trial unfair. *See Bible,* 175 Ariz. at 564, 858 P.2d at 1167 (stating that passage of several months mitigated effect of potentially prejudicial news articles).

## (b) Actual Prejudice

■ Defendant next argues that even if the pretrial publicity does not require this court to presume-prejudice, it was pervasive enough to have an unfair influence on the

jury, causing him actual prejudice and depriving him of a fair trial. Where prejudice is not presumed, the defendant must prove that the pretrial publicity probably deprived him of a fair trial. *Bible,* 175 Ariz. at 566, 858 P.2d at 1169; *see also* Ariz.R.Crim.P. 10.3(b). The focus is on whether the potential jurors " 'could not judge impartially the guilt of the defendant.' " *Bible,* 175 Ariz. at 566, 858 P.2d at 1169 (quoting *Patton v. Yount,* 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984)). In judging the impact of pretrial publicity on a trial, "the relevant inquiry is the effect of the publicity on a juror's objectivity, not the mere fact of publicity." *Id.*

 Of the fifteen jurors who heard the case (three of whom eventually became alternates), only five had any prior knowledge of the case. Moreover, their knowledge was sparse, consisting only of vague recollections of factual information, all of which was eventually admitted into evidence. One juror recalled having read and seen media reports about the murder at the time it happened, but could recall only that the victim "wasn't found for a little while." A second juror remembered that the body was found in an abandoned car. A third recalled having seen the victim's photograph on television. A fourth recalled that an "infant was taken out of the bedroom window or something" and that the body was found several days later. Finally, a fifth juror remembered reading about the case and that "it wasn't recent. . . . Something about a screen and something about a car in a back yard and about the little girl that was killed. . . . That she was taken from her bedroom and, as I remember, that the body was found in a car outside or in back. That's all I remember." The trial court's voir dire was very thorough, and none of the jurors' recollections persuades us that any juror was unable to be objective and render a fair verdict. *See id.* (relying on a fully developed voir dire record in deciding actual prejudice).

## 2. Death Qualification of Jurors

Defendant claims that the trial court erred by questioning potential jurors regarding their views on the death penalty and on their ability to follow the court's instructions in light of those views. The trial court did not err. *West,* 176 Ariz. at 439–40, 862 P.2d at 199–200.

## 3. Dismissal of Jurors for Cause

Defendant argues that the trial court erred in striking four jurors for cause when they said their opposition to the death penalty might affect their deliberations on guilt. The state claims defendant waived this claim by failing to make proper objections to the dismissals below. While the state's argument has some merit, based on our review of the record we decide to reach the merits of the issue.

 A potential juror may be excused for cause if the trial court believes that his attitude will "prevent or substantially impair the performance of his duties." *State v. LaGrand,* 153 Ariz. 21, 33, 734 P.2d 563, 575 (1987) (quoting *Wainwright v. Witt,* 469 U.S. 412, 419, 105 S.Ct. 844, 850, 83 L.Ed.2d 841 (1985)), *cert. denied,* 484 U.S. 872, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987). This court reviews such findings to see whether they "are fairly supported by the record considered as a whole." *Id.*

 The record here supports the trial court's findings. Three of the four jurors dismissed expressed unequivocal opposition to the death penalty and said that it might affect their deliberations. The fourth expressed the same views, but in an equivocal manner. All had been instructed that the judge would do the sentencing. Based on these responses, the trial court was justified in dismissing these jurors, even the one who spoke equivocally. Jurors need not express unequivocal opposition to the death penalty for a trial judge to properly dismiss them for cause. *Id.* at 31–33, 734 P.2d at 573–75.

## 4. State's Use of Peremptory Strikes

Defendant argues that the state's exercise of its peremptory challenges to remove persons with reservations about the death penalty violated defendant's right to a fair and impartial jury under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), *modified, Powers v. Ohio,* 499 U.S. 400, 111

S.Ct. 1364, 113 L.Ed.2d 411 (1991).[2] In *Batson*, the Supreme Court held that a state may not use peremptory challenges to remove jurors solely on account of their race. *Id.* at 89, 106 S.Ct. at 1719. The Court later extended its holding to prohibit purposeful gender discrimination in jury selection as well. *J.E.B. v. Alabama ex rel. T.B.,* — U.S. —, —, 114 S.Ct. 1419, 1421, 128 L.Ed.2d 89 (1994).

▮ The *Batson* rule does not, however, apply to cases where the state uses its peremptory strikes to remove potential jurors not excludable for cause who have expressed reservations about capital punishment. The Supreme Court made this perfectly clear in *J.E.B.* when it said, "Parties may … exercise their peremptory challenges to remove from the venire any group or class of individuals normally subject to 'rational basis' review." — U.S. at —, 114 S.Ct. at 1429. Nothing about a person's views on the death penalty invokes heightened scrutiny under the Equal Protection Clause. Thus, *Batson* does not limit the use of peremptory challenges to exclude jurors because of their reservations about capital punishment.

Even before *J.E.B.,* several courts considered this question, and all agreed with the conclusion we reach today. *E.g., United States v. Villarreal,* 963 F.2d 725, 729 (5th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 353, 121 L.Ed.2d 267 (1992); *Brown v. Dixon,* 891 F.2d 490, 496–98 (4th Cir.1989), *cert. denied,* 495 U.S. 953, 110 S.Ct. 2220, 109 L.Ed.2d 545 (1990); *People v. Davis,* 794 P.2d 159, 208–09 (Colo.1990), *cert. denied,* 498 U.S. 1018, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991); *Lucas v. State,* 568 So.2d 18, 20 n. 2 (Fla.1990); *State v. Wacaser,* 794 S.W.2d 190, 196 (Mo.1990); *State v. Seiber,* 56 Ohio St.3d 4, 564 N.E.2d 408, 419 (1990); *Romano v. State,* 847 P.2d 368, 377–78 (Okla.Crim.App. 1993), *aff'd,* — U.S. —, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994);[3] *Hernandez v. State,*

819 S.W.2d 806, 817–18 (Tex.Crim.App.1991), *cert. denied,* 504 U.S. 974, 112 S.Ct. 2944, 119 L.Ed.2d 568 (1992). There was no *Batson* violation.

### 5. Impeachment by Prior Conviction Under the Rules of Evidence

▮ Defendant claims that under Rule 609, Arizona Rules of Evidence, the trial court should not have permitted the use of his prior convictions on the issue of credibility. Under the facts of this case, we see no reason to make a definitive ruling on the merits of his claim because, wholly apart from the prior convictions, defendant testified that he was a thief and had committed a murder other than the murder for which he was charged. Thus, the admission of his prior convictions on the issue of credibility, if error at all, was harmless.

At the time of his trial, defendant had five prior convictions. In Arizona, he had been convicted of theft, possession of burglary tools, kidnapping, and sexual abuse. He had been convicted of aggravated battery in Illinois. During pretrial motions, the trial court ruled that it would allow the prosecution to use the convictions for kidnapping, sexual abuse, possession of burglary tools, and battery to impeach defendant if he testified. Defendant testified and admitted to the prior convictions on direct examination. He also testified, however, that he had committed several other crimes for which he had never been charged. Specifically, he testified that he had stolen a gun, stolen a car, and committed a murder other than the one at issue here.

▮ Under Rule 609, a court can admit evidence that a witness has been convicted of a crime if the witness admits the prior conviction or if public records establish it. The court must determine, first, that its probative value outweighs its prejudicial effect and,

---

2. The state correctly notes that defendant did not make a simultaneous objection and that *Batson* issues are waived absent such an objection. *See Cruz,* 175 Ariz. at 398, 857 P.2d at 1252; *Holder,* 155 Ariz. at 85–86, 745 P.2d at 143–44. Because we have not previously addressed the issue and because it is likely to recur, we reach it.

3. Although defendant relies heavily on *Romano v. State,* its holding is contrary to his position. The Oklahoma court said, "No authority supports the proposition that equivocal jurors create a suspect class which invokes the stringent requirements of the Equal Protection Clause, and which would permit extension of the limited *Batson* rule." 847 P.2d at 377.

second, that the crime was punishable by death or imprisonment of more than one year or involved dishonesty or false statement. Ariz.R.Evid. 609(a). These determinations are within the judge's discretion, and an appellate court will not upset the trial court's ruling absent an abuse. *State v. Perkins,* 141 Ariz. 278, 283, 686 P.2d 1248, 1253 (1984).

■ Defendant's trial counsel urged exclusion of the priors, arguing that they were *dissimilar* to the charged offenses. Defendant's appellate counsel argues their admission was prejudicial because the priors were too *similar* to the charged offenses. Appellate counsel's argument is closer to the mark. When prior convictions are similar to the charged offense, the potential for prejudice is particularly strong. *Gordon v. United States,* 383 F.2d 936, 940 (D.C.Cir.1967), *cert. denied,* 390 U.S. 1029, 88 S.Ct. 1421, 20 L.Ed.2d 287 (1968). The reason is clear— similarity to the charged offense may lead to the unfair inference that if defendant "did it before he probably did so this time." *Id.* As such, a trial court should sparingly admit evidence of prior convictions when the prior convictions are similar to the charged offense; or in appropriate cases, the trial court may reduce the risk of prejudice by admitting the fact of a prior conviction without disclosing the nature of the crime. *State v. White,* 160 Ariz. 24, 31, 770 P.2d 328, 335 (1989); *State v. Williams,* 144 Ariz. 479, 482, 698 P.2d 724, 727 (1985).

■ Because defendant's prior convictions were so similar to the crimes for which he was charged, a close question is presented as to whether the trial court abused its discretion. Be that as it may, even if the trial court abused its discretion in admitting defendant's prior convictions, the error was harmless. Absent "structural defects," which are not subject to harmless error analysis, an error is harmless "if we can say, beyond a reasonable doubt, that the error did not contribute to or affect the verdict." *Bible,* 175 Ariz. at 588, 858 P.2d at 1191. The inquiry on review "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Sullivan v. Louisiana,* —— U.S. ——, ——, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993). Improper admission of evidence of prior convictions is subject to harmless error analysis. *See Luce v. United States,* 469 U.S. 38, 42, 105 S.Ct. 460, 463–64, 83 L.Ed.2d 443 (1984).

Any prejudice that admission of the prior convictions could have caused in this particular case is merely redundant to the prejudice caused by defendant's own testimony. If the jury was inclined to draw unfair inferences from defendant's prior convictions, it was equally inclined to draw essentially the same inferences from defendant's own testimony. This is not a situation where the defendant's testimony was compelled by the ruling admitting the prior convictions. Here, defendant's testimony concerning his own criminality, including theft and murder, was wholly independent of his prior convictions and was at least as damaging to him as evidence of those convictions.

## 6. Introduction of Expert Opinion

Defendant contends that the trial court should not have admitted expert opinion that purported to explain why the victim's clothing had been replaced. The state contends that trial counsel's objections were insufficient to preserve the issue. Based on our review of the record, we reject the state's waiver argument insofar as the foundation of the testimony is concerned, and conclude that the testimony should not have been admitted. We further conclude, however, that the error is not reversible.

Defendant called detective Steven Bunting, who had previously testified during the state's case, and examined him on evidence found at the victim's home. On cross-examination by the prosecutor, the following exchange took place:

Q: Are you familiar with the phenomenon of child sex murderers who are interested in restoring their victim[s] to their original appearance after death?

A: I have heard that spoken of, yes.

Q: In your professional opinion, would that account for Zosha's being reclothed after she was stabbed?

[Defense counsel]: I am going to object as to foundation and speculation.

The Court: Sustained.

. . . .

[Prosecutor]: Did you [draw on your knowledge and experience] in trying to evaluate and solve what happened to Zosha . . .?

A: Yes, we did.

Q: Does that lead you to a possible conclusion as to why Zosha was reclothed?

[Defense counsel]: Same objection, Your Honor.

The Court: No, you may go ahead and give your opinion.

A: Yes, one of the opinions that we did come up with was that the suspect had possibly reclothed—

[Defense counsel]: I am going to object.

The Court: Sustained, yeah.

Q: Do you have a conclusion that you reached as a result of your work and research on this case?

A: A possible conclusion, yes.

Q: Will the witness be allowed to state it?

The Court: He may give his expert opinion, if he has one.

[Prosecutor]: Thank you.

The Court: Go ahead.

A: One of the—there were a number of conclusions that were spoken of, but in contacting other officers, in contacting the FBI, Behavioral Science Division, other departments, one of the theories was that the person involved after Zosha had been stabbed had reclothed the victim in an attempt to restore her to her state before the act had been committed.

Defendant claims this testimony was erroneously admitted because (1) it is unreliable and (2) Bunting was not qualified as an expert. Defendant also claims that the testimony (1) violated the Arizona Rules of Crimi-

nal Procedure and his right to due process because it took him by surprise; (2) violated his right to confrontation and due process; and (3) constituted an impermissible application of a specialized theory to the facts of a particular case.

■ Defendant's objection to foundation and speculation, however, did not even arguably raise these latter three issues in the court below. This court will not consider an evidentiary theory when it is advanced for the first time on appeal. *State v. Schaaf,* 169 Ariz. 323, 332, 819 P.2d 909, 918 (1991) (holding that an objection to testimony as cumulative did not preserve a claim of error on the ground of probing work product); *see also State v. Hernandez,* 170 Ariz. 301, 306–07, 823 P.2d 1309, 1314–15 (App.1991) (holding that a hearsay objection did not preserve a claim of error based on the Confrontation Clause). Defendant has waived these latter three issues, and none constitutes fundamental error.

There are four requirements for admission of expert testimony.[4] *See State v. Moran,* 151 Ariz. 378, 380, 728 P.2d 248, 250 (1986). Under our cases and Rules of Evidence, expert testimony generally must (1) come from a qualified expert, (2) be reliable, (3) aid the trier of fact in evaluating and understanding matters not within their common experience, and (4) have probative value that equals or outweighs its prejudicial effect. *Moran,* 151 Ariz. at 380, 728 P.2d at 250; Ariz.R.Evid. 403, 702–03.

■ The state did not lay sufficient foundation to show that Bunting's "expert opinion" would be reliable. The major premise for Bunting's conclusion was the "phenomenon" that some child sex murderers try to restore their victims. The prosecution, however, failed to elicit testimony establishing the methods, facts, or data upon which the "phenomenon" was based. *See State v. Roscoe,* 145 Ariz. 212, 220–21, 700 P.2d 1312, 1320–21 (1984) (holding foundation to be suf-

---

4. Defendant urges us to apply the rules applicable to scientific evidence. However, because Bunting's opinion did not involve the application of scientific methods to samples or data to reach conclusive results and did not have the "direct and forceful dispositive effect" normally associat-
ed with scientific evidence, we conclude that Bunting's testimony was not scientific evidence. *See Bible,* 175 Ariz. at 580, 858 P.2d at 1183; *Baroldy v. Ortho Pharmaceutical Corp.,* 157 Ariz. 574, 581, 760 P.2d 574, 581 (App.1988).

ficient where witness explained the particular training and methods employed), *cert. denied,* 471 U.S. 1094, 105 S.Ct. 2169, 85 L.Ed.2d 525 (1985); *Adams v. Amore,* 182 Ariz. 253, 895 P.2d 1016 (App.1994) (holding foundation to be insufficient where witness did not establish the representative validity of his test sampling and reliability of his data). In fact, other than Detective Bunting's statement that he had "heard it spoken of," nothing in the record suggests that the child sex murderer "phenomenon" even exists. Because of the lack of adequate foundation, the trial court should not have admitted the testimony. Detective Bunting's "expert" qualifications with regard to this particular topic are also highly questionable. But because we find that the opinion was unreliable and should not have been admitted, we need not address the issue of expert qualifications here.

■ The opinion was admitted erroneously. However, because we believe defendant suffered no prejudice, the error is not reversible. *See State v. Chapple,* 135 Ariz. 281, 297, 660 P.2d 1208, 1224 (1983) (holding that errors in admitting evidence were reversible only after concluding that the errors were prejudicial). Bunting's opinion was very noncommittal. He identified only "one of the theories" of the case and did not express an opinion on the likelihood that the theory actually explained the case accurately. Nor did the testimony introduce a sexual motive. Evidence of semen stains and the removal and replacement of the victim's clothing had already been admitted. We conclude that Bunting's statement had no effect on the jury's verdict.

### 7. Gruesome Photograph

Defendant argues that it was error to admit into evidence four eight-by-ten color photographs of the victim's body. In the trial court, however, he objected only to one—a close-up autopsy photograph of the victim's chest showing the features of the stab wound, Exhibit 110. We will address only the one photograph. *See State v. Harding,* 137 Ariz. 278, 291, 670 P.2d 383, 396 (1983), *cert. denied,* 465 U.S. 1013, 104 S.Ct. 1017, 79 L.Ed.2d 246 (1984).

■ The admissibility of photographic exhibits is within the sound discretion of the trial court and will not be overturned on appeal absent an abuse of that discretion. *State v. Rushing,* 156 Ariz. 1, 2–3, 749 P.2d 910, 911–12 (1988). To be admissible into evidence, photographs must be relevant. Ariz.R.Evid. 402; *Rushing,* 156 Ariz. at 3, 749 P.2d at 912. When the photographs, however, have the tendency to incite passion or inflame the jury, "the court must go beyond the question of relevancy and consider whether the probative value of the exhibit outweighs the danger of prejudice created by admission of the exhibit." *Chapple,* 135 Ariz. at 288, 660 P.2d at 1215; *see* Ariz.R.Evid. 403.

■ Defendant argues initially that the judge abused his discretion because he did not expressly weigh probative value against potential for prejudice when he denied defendant's motion to suppress. We disagree. The record clearly reflects the judge's consideration of defendant's motion to suppress, and a finding that the probative value of the photograph outweighed its potential for prejudice is inherent in the court's denial of the motion.

Defendant argues next that the trial court abused its discretion because the photograph was "gruesome and unduly prejudicial." Again, we disagree. A reasonable trial judge could easily have found the probative value of the photograph to outweigh its potential for prejudice. The photograph was probative to show the nature of the fatal injury and the features of the wound, topics about which both the prosecution and the defense carefully questioned the medical examiner. *See LaGrand,* 153 Ariz. at 31, 734 P.2d at 573 (holding that photographs may be used to illustrate the testimony of the state's medical expert); *Chapple,* 135 Ariz. at 288, 660 P.2d at 1215 (stating that photographs may be used to corroborate state witnesses and to illustrate and explain testimony). Also, the photograph is not so gruesome as to make its admission an abuse of discretion. *See State v. Castaneda,* 150 Ariz. 382, 391, 724 P.2d 1, 10 (1986) (holding that photographs of stab wounds in victim's chest and victim's nude

body smeared with blood were properly admitted); *State v. Poland*, 144 Ariz. 388, 401, 698 P.2d 183, 196 (1985) (holding that photograph of victim's body and close-up photograph of victim's torso and decomposed head were properly admitted), *aff'd*, 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986).

### 8. Admission of Serological Evidence

Defendant complains on appeal about a statement by criminalist Steven Clemons, a serology expert, who testified on semen and blood group substances. The challenged testimony eventually related to two semen stains on an athletic sock found in the back of the taxicab. Testimony at trial established that for serological identification purposes, the population can be divided into two groups—secretors and nonsecretors. A secretor is someone who secretes his blood group substances into his other body fluids such as saliva, semen, and vaginal secretions. Conversely, a nonsecretor does not secrete his blood group substances into his other body fluids. Qualified experts testified that a fluid sample from a nonsecretor will not reveal the donor's blood type.

On direct examination, Clemons testified that in a hypothetical sexual assault case where there is a semen stain showing the presence of blood group substance B, the victim has type B blood, and the possible donor of the semen is a nonsecretor, it is possible that the semen stain could contain vaginal secretions from the victim. Defense counsel did not object to the testimony and on cross-examination questioned Clemons at length on the possibility of a victim's vaginal secretions being mixed with an attacker's semen.

On redirect examination, the prosecutor asked, "[I]n your experience, when you are talking about possible sexual assault cases, ... is it unusual for you to find a dried semen stain in an area around where the

sexual assault is supposed to have occurred that contains a mixture of vaginal secretions and semen?" Over defendant's objection to "form and foundation," Clemons replied, "[I]t doesn't surprise me that I might find vaginal secretions on a stain, or if I understand this right, it's not surprising to find a stain somewhere away from the body that has been identified as semen that might have some blood group substances consistent with the victim."

Defendant argues that allowing this last statement by Clemons was reversible error because it constitutes scientific evidence admitted without proper foundation. We conclude, however, that even assuming that the trial court admitted the statement in error, it was cumulative and harmless. Three different criminalists testified at length about serology and blood group typing. Steven Garrett, a serologist who testified immediately before Clemons, testified that a semen stain containing type B and H blood group substances would be consistent with having been involved with a person with type B blood. Serologist Edward Heller, who testified immediately after Clemons, testified about test results on the actual sock and said that the type B blood group substances found in the semen stain may be associated with the same individual responsible for the type B blood found on the taxicab floor and the victim's panties. Defendant did not object to any of this testimony.[5] Given the extensive exposition of the issue by both the prosecution and the defense and the even more positive testimony of the other serology experts, we have no trouble concluding beyond a reasonable doubt that Clemons' statement had no effect on the jury's verdict.

### 9. Prosecutorial Misconduct

Defendant alleges several instances of prosecutorial misconduct that he contends either on their own or in combination with

---

5. Defendant argues in his reply brief that Heller's testimony was also admitted in error and that his objection to Clemons' statement was sufficient to preserve a challenge to Heller's testimony as well. We disagree. A previously made motion to preclude particular testimony preserves the issue for appeal, even if there is no objection contemporaneous to the challenged testimony. *State v. Lindsey*, 149 Ariz. 472, 475–76, 720 P.2d 73, 76–77 (1986); *State v. Coleman*, 122 Ariz. 99, 101, 593 P.2d 653, 655 (1979). Here, however, defendant made no prior motion to preclude Heller's particular testimony. Thus, to preserve the issue, defendant must have made a contemporaneous objection.

one another denied him a fair trial. However, he objected to only two of the instances at trial: improper use of criminal history and improper cross-examination of the defendant. Because none of the other instances approaches fundamental error, we discuss only the two raised in the trial court.

■ To require reversal on the basis of prosecutorial misconduct, the conduct must have been so pronounced and persistent that it permeated the entire trial and probably affected the outcome. *Atwood,* 171 Ariz. at 611, 832 P.2d at 628. Motions for mistrial based on prosecutorial misconduct are committed to the trial court's discretion, which will not be disturbed on appeal unless plainly abused. *State v. Woods,* 141 Ariz. 446, 455–56, 687 P.2d 1201, 1210–11 (1984). When faced with a claim of misconduct, we look first to determine whether counsel's actions were "reasonably likely to have affected the jury's verdict, thereby denying defendant a fair trial." *Cornell,* 179 Ariz. at 328, 878 P.2d at 1366. Applying these rules to the facts of this case, we hold that neither alleged instance of prosecutorial misconduct required a mistrial. We discuss each in turn.

### (a) Alleged Improper Use of Criminal History

During closing argument, the prosecutor described how the police had gone about identifying suspects and said that police "knew Daren Bolton was a kid who frequently hung out in this neighborhood, and, in fact, he had a sex-related conviction from the location of Speedway and Country Club, not far from where [the victim] was kidnapped." At the close of argument, defendant moved for a mistrial because the prosecution had used his prior conviction to argue for his guilt instead of for the proper purpose of impeachment.

■ The trial court did not abuse its discretion in denying the motion for mistrial. We do not believe it reasonably likely that the prosecutor's reference to defendant's prior conviction had any effect on the jury's verdict. By the time of closing arguments, evidence of defendant's prior conviction for kidnapping and sexual abuse had been admitted, which alone distinguishes this case from all the cases that defendant cites in his opening brief. *See, e.g., State v. Holsinger,* 124 Ariz. 18, 21, 601 P.2d 1054, 1057 (1979) (holding that it was reversible error to imply that the defendant had a long criminal record when she in fact did not); *State v. Neil,* 102 Ariz. 299, 300, 428 P.2d 676, 677 (1967) (holding that it was reversible error to comment on defendant's record when no evidence of prior convictions had been admitted); *State v. McGill,* 101 Ariz. 320, 321, 419 P.2d 499, 500 (1966) (holding that it was error to call defendant an "addict" where there was no competent evidence that he had used drugs habitually or had been convicted of a drug offense). The trial court here instructed the jury on the proper use of defendant's prior convictions immediately before argument began, and the prosecutor reinforced the instruction during her argument. We do not believe the prosecutor's reference to defendant's prior conviction affected the outcome of the trial.

### (b) Alleged Improper Cross–Examination

Defendant testified that he had gone to the victim's window with an accomplice intending to commit a burglary, that they had been scared off by the dog, that the accomplice had later returned to the house alone and kidnapped the victim, and that he had since killed the accomplice and buried his body in the desert. On cross-examination, the prosecution asked, "Mr. Bolton, are you willing to take [the] detectives from homicide out to this alleged location in the desert where you expect us to believe you buried the body of the so-called Phil person?"

■ In response to defendant's testimony that he had stolen a gun to kill his accomplice, but could not remember to whom he sold it, the prosecutor asked, "And you expect the jury to believe this story, Mr. Bolton?" Pointing out to defendant that he had not given any concrete details about the alleged accomplice or the whereabouts of his body, the prosecutor asked, "So you are kind of in a nice position here, we don't have any information with which to charge you with murder, do we?" Finally, the prosecutor asked:

But you thought you would take a gun and a shovel out into the desert to kill somebody about who you knew virtually nothing?

A: Stranger things have happened.

Q: Stranger things have happened. You bet, Mr. Bolton.

[Defense Counsel]: Your Honor I am going to object to Counsel's continuing comments.

The Court: Sustained. Approach the Bench.

(discussion at the bench as follows)

The Court: No more argumentative questions.

[Prosecutor]: I apologize.

Defendant argues that these questions constitute improper cross-examination.

The questioning may have been argumentative. Nevertheless, the misconduct was not so egregious that it permeated the entire trial and probably affected the outcome. *Atwood*, 171 Ariz. at 611, 832 P.2d at 628. Unlike the case cited by defendant, *Pool v. Superior Court*, 139 Ariz. 98, 677 P.2d 261 (1984), the prosecutor here did not call defendant pejorative names, refer to matters not in evidence, suggest unfavorable matter for which no proof exists, or abuse defendant in any other way. Defendant has not shown how the alleged misconduct affected the outcome of his trial. There was no abuse of discretion in denying a mistrial.

## 10. Denial of Directed Verdict

Defendant moved for a directed verdict of acquittal at the close of the state's case and renewed the motion at the close of his own case and at the close of all the evidence. The trial court denied all the motions for directed verdict. Defendant claims that the trial court erred.

■ Defendant first asks us to overrule existing cases in which we held that a defendant who goes forward and presents a case waives any error if his case supplies evidence missing in the state's case. *See, e.g., State v. Nunez*, 167 Ariz. 272, 279, 806 P.2d 861, 868 (1991). Following that law, appellate courts review motions for acquittal based on the entire record, including any evidence defendant may have later supplied. *Id.* The rule finds unquestioned support in our cases, *e.g., id.; State v. Savoy*, 109 Ariz. 531, 532, 514 P.2d 452, 453 (1973); *State v. Marchesano*, 162 Ariz. 308, 312, 783 P.2d 247, 251 (App. 1989), and defendant's argument does not persuade us to overrule it.

■ Examining, then, the entire record, we conclude that there was no error. Where there is a complete absence of probative facts to support a conviction, this court will reverse a trial court's denial of a motion for directed verdict. *State v. Mathers*, 165 Ariz. 64, 66, 796 P.2d 866, 868 (1990). In reviewing the denial of a motion for directed verdict, we view the evidence in favor of upholding the jury's verdict. There was ample evidence to defeat defendant's motions for directed verdict.

## 11. Lost or Destroyed Evidence Instruction

During the course of the investigation, the state returned the taxicab to its owner, who scrapped it, and the state also discarded at least ten fingerprint specimens. Defendant argues that the trial court should have given the jury a *Willits* instruction, which would have instructed the jury that if it found that the state had lost or destroyed evidence whose content or quality was in issue, it may infer that the true fact is against the state's interest. *State v. Willits*, 96 Ariz. 184, 187, 393 P.2d 274, 276 (1964). The state challenges the adequacy of the record to preserve this issue for appeal, but we believe the *Willits* request was adequate insofar as the cab and the fingerprint specimens are concerned. Defendant also contends on appeal that a *Willits* instruction should have been given with respect to other items of allegedly lost or destroyed evidence. Because defendant did not, however, bring these other items to the attention of the trial judge, we do not consider them.

■ With respect to the cab and the fingerprint specimens, defendant was not entitled to a *Willits* instruction. A defendant is entitled to a *Willits* instruction only upon proof that (1) the state failed to preserve material evidence that was accessible and

might have tended to exonerate him, and (2) there was resulting prejudice. *State v. Leslie,* 147 Ariz. 38, 47, 708 P.2d 719, 728 (1985). The decision to refuse a jury instruction is within the trial court's discretion, and this court will not reverse it absent a clear abuse of that discretion. *Atwood,* 171 Ariz. at 627, 832 P.2d at 644.

It is highly unlikely that the discarded fingerprint cards or the taxicab would have produced any exculpatory evidence. The fingerprint samples lacked sufficient ridge detail to compare to any known print, and the taxicab, before being scrapped, had been extensively photographed and tested, the results of which were disclosed to defendant. The trial judge did not abuse his discretion in denying the *Willits* instruction.

## 12. Termination of Conspiracy Instruction

As we have previously noted, defendant testified that he went to the victim's home with an accomplice to steal drugs and money, that the family dog scared them away, and that the accomplice later returned alone to kidnap and kill the victim. The conspiracy terminated, according to defendant, when the dog scared them away. Defendant argues that because of this and other evidence, the trial court should have instructed the jury that defendant could not be held legally responsible for the post-termination acts of his co-conspirator.

 Defendant was not entitled to such an instruction. A party is entitled to an instruction on any theory of the case reasonably supported by the evidence. *State v. Shumway,* 137 Ariz. 585, 588, 672 P.2d 929, 932 (1983). However, when a jury is properly instructed on the applicable law, the trial court is not required to provide additional instructions that do nothing more than reiterate or enlarge the instructions in defendant's language. *State v. Salazar,* 173 Ariz. 399, 409, 844 P.2d 566, 576 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 3017, 125 L.Ed.2d 707 (1993).

Defendant's theory of the case was encompassed in the felony murder instruction. *See id.* The trial court instructed the jury on felony murder as follows:

> A person commits first degree murder if *such person* commits kidnapping and in the course of, and in furtherance of such offense, or immediate flight from such offense, *such person* causes the death of any person. This type of first degree murder requires no specific mental state other than that which is required for the commission of the offense of kidnapping.

(Emphasis added.)

 There were no instructions on conspiracy or on any form of accomplice liability. As instructed, the jurors could convict defendant of first degree murder only if they found that he himself killed the victim. If the jury thought that someone else killed the victim, they were required to find defendant not guilty of murder. Under these circumstances, there was no need for a termination of conspiracy instruction.

## 13. Unlawful Imprisonment Instruction

 Defendant argues that he was entitled to an unlawful imprisonment instruction because it is a lesser included offense of kidnapping. According to defendant, the jury could have concluded that defendant removed the victim from her room, but lacked the requisite intent for kidnapping. A defendant in a capital case is entitled to an instruction on all lesser included offenses supported by the evidence. *State v. Tucker,* 157 Ariz. 433, 447, 759 P.2d 579, 593 (1988). Unlawful imprisonment may be a lesser included offense of kidnapping. *State v. Caudillo,* 124 Ariz. 410, 412, 604 P.2d 1121, 1123 (1979).

Defendant was not entitled to an instruction on unlawful imprisonment. The fact that a jury could disbelieve all the evidence of the greater charge in a given case except the elements of the lesser does not necessarily require an instruction on the lesser. *Atwood,* 171 Ariz. at 629, 832 P.2d at 646. To require so would mandate instructions on all offenses theoretically included in every charged offense. *Id.* The evidence must support the lesser included offense. *Id.* at 628, 832 P.2d at 645.

■ The evidence supports only the offense of kidnapping. The victim was taken surreptitiously by a stranger in the dark, taken to a secluded place, disrobed, and deliberately stabbed. From this, a reasonable jury could only infer that whoever took Zosha intended to harm her. Furthermore, defendant presented an alibi defense. "[W]hen a defendant proffers an alibi defense, the record usually contains little evidence to support an instruction on a lesser included offense." *Id.* at 629, 832 P.2d at 646 (discussing request for unlawful imprisonment instruction). Defendant claimed that he had no contact at all with the girl, not that he took her but did not intend to harm her. An instruction on unlawful imprisonment runs counter to the entire thrust of his defense. *Id.* at 628, 832 P.2d at 645. Under these circumstances, neither defendant nor the state has advanced a theory to support the lesser included offense of unlawful imprisonment. *Id.* at 629, 832 P.2d at 646.

## III. SENTENCING ISSUES

### 1. Constitutionality of Arizona's Death Penalty Statute

■ Under A.R.S. § 13–703(F)(9), an aggravating circumstance is established when an adult commits first degree murder of a victim under fifteen years of age. Defendant argues that this amounts to an automatic death sentence and is unconstitutional. We disagree. As long as state law requires consideration of all mitigating circumstances, it is not unconstitutional to impose the death penalty by statutory mandate if one or more aggravating factors are present and mitigating circumstances are insufficient to warrant leniency. *Walton v. Arizona*, 497 U.S. 639, 651–52, 110 S.Ct. 3047, 3056, 111 L.Ed.2d 511 (1990); *State v. White*, 168 Ariz. 500, 514, 815

P.2d 869, 883 (1991), *cert. denied*, 502 U.S. 1105, 112 S.Ct. 1199, 117 L.Ed.2d 439 (1992).

### 2. Double Counting the Victim's Age

■ Defendant argues that the trial judge found the age of the victim to be an aggravating factor under section 13–703(F)(9) and then also considered the victim's age under section 13–703(F)(6) (especially heinous, cruel, or depraved). Although defendant claims that the trial court stated that it had considered the victim's age twice, the record does not support this claim. In support of his argument, defendant offers only that the judge used the word "child" to refer to the victim in five of the seven factors upon which he relied in finding the section 13–703(F)(6) aggravating circumstance.[6]

Even if the victim's age was used to establish both the (F)(6) and (F)(9) aggravating circumstances, such use is proper provided the sentencing court, in balancing the aggravating and mitigating factors, does not weigh the age of the victim twice. *State v. Styers*, 177 Ariz. 104, 116, 865 P.2d 765, 777 (1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 159, 130 L.Ed.2d 97 (1994); *State v. Milke*, 177 Ariz. 118, 127, 865 P.2d 779, 788 (1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2726, 129 L.Ed.2d 849 (1994); *State v. Scott*, 177 Ariz. 131, 144, 865 P.2d 792, 805 (1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 129, 130 L.Ed.2d 73 (1994).

We do not believe, however, that the trial judge used the victim's age to support both factors; and, even if he did, we find nothing in the record to indicate that he weighed the age twice. Defendant simply reads too much into the trial court's use of the word "child." From the trial court's choice of words, we cannot infer that it misapplied the law. In fact, the only one of the seven factors that

6. The trial court's special verdict on the (F)(6) factor reads as follows:

The Court relied upon the following factors in determining that the offense was committed in an especially heinous, cruel or depraved manner.

1. The child was kidnapped from her own bed.
2. The child was, at the very least, partially disrobed by the defendant, and then, redressed by the defendant.

3. The child was under emotional and mental distress throughout the kidnapping and murder.
4. The child suffered excruciating pain prior to death.
5. The child was defenseless.
6. The killing was senseless.
7. The nature of the attack is repugnant to society.

depends at all on the victim's age for explanation is the finding of defenselessness.

### 3. Especially Heinous, Cruel, or Depraved

Defendant argues that the state did not prove beyond a reasonable doubt that the murder was committed in an especially heinous, cruel, or depraved manner. *See* A.R.S. § 13–703(F)(6). Because the words in the statute are in the disjunctive, a finding of any one of the three factors will suffice to establish this aggravating factor. *West*, 176 Ariz. at 448, 862 P.2d at 208. The evidence amply supports the trial court's finding of cruelty.

■ A murder is especially cruel if the victim consciously experiences physical abuse or mental anguish before death. *State v. Lopez*, 175 Ariz. 407, 411, 857 P.2d 1261, 1265 (1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994). To support a finding of cruelty, the state must prove beyond a reasonable doubt that the victim was conscious and suffered pain or distress at the time of the offense. *State v. Jimenez*, 165 Ariz. 444, 453, 799 P.2d 785, 794 (1990). If the evidence is inconclusive as to whether the victim was conscious during the infliction of violence, the court cannot find that the killing was especially cruel. *State v. Gillies*, 142 Ariz. 564, 569, 691 P.2d 655, 660 (1984).

■ We conclude first that the victim was conscious for a considerable period of time between the beginning of the crimes and her death. Although defendant claims that the victim never awoke from her sleep, the evidence shows that she did. The victim's fingerprints were found on the inside of the rear left taxicab window with the fingers pointing upward, the pattern of the prints indicating repeated tapping or patting. Her prints were also found wrapped around the inside right door handle. The pattern of the blood stains in the taxicab indicates that the victim was upright sometime after being stabbed. This evidence along with the absence of any injury that could have impaired the victim's consciousness before infliction of the stab wound proves beyond a reasonable doubt that the victim was conscious during the attack.

We conclude next that the victim suffered both physical pain and mental anguish before she died. The victim was kidnapped from her own bed in the dark by a stranger, carried two blocks, put in the back of a filthy car, disrobed, and stabbed to death. Obviously, the three-year-old victim was terrified beyond imagination. She had never seen defendant before, and the attack transpired over an extended period of time. *See Jimenez*, 165 Ariz. at 454, 799 P.2d at 795 (holding that the victim did not suffer before the fatal wound partly because victim knew and liked defendant and because the attack was sudden and by surprise).

Even more persuasive, though, is the evidence that the victim suffered *after* defendant inflicted the fatal wound. A medical examiner testified that a person with a wound similar to the victim's would experience "excruciating pain" and die over a period of fifteen to thirty minutes. Defendant correctly asserts that the medical examiner's fifteen to thirty minute estimate refers to the entire process of dying, not to the length of consciousness. This, however, makes no difference. Even if the period of conscious suffering was brief, it can support a finding of cruelty. *See State v. Runningeagle*, 176 Ariz. 59, 65, 859 P.2d 169, 175 (finding of cruelty based in part on testimony that the victims lived for three to four minutes after being stabbed), *cert. denied*, —— U.S. ——, 114 S.Ct. 609, 126 L.Ed.2d 574 (1993); *Greenway*, 170 Ariz. at 165–66, 823 P.2d at 32–33 (finding of cruelty based on suffering for as long as it took to place a pillow over the victim's head, chamber a round in a bolt action rifle, and fire it).

■ Finally, in order for suffering experienced *after* infliction of the fatal wound to support a finding of cruelty, the suffering must have been objectively foreseeable. *See State v. Walton*, 159 Ariz. 571, 587, 769 P.2d 1017, 1033 (1989), *aff'd*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); *see also State v. Greenway*, 170 Ariz. 155, 165–66, 823 P.2d 22, 32–33 (1991). Defendant argues that "[w]hen there is a single mortal wound, the [victim's] suffering must be intended or foreseeable." This is a misstatement of the law. To support a finding of cruelty, only

*postwound* suffering must be foreseeable. *See Walton,* 159 Ariz. at 587, 769 P.2d at 1033. A defendant's subjective intent to cause suffering and the singularity of the wound are irrelevant altogether. *Greenway,* 170 Ariz. at 166, 823 P.2d at 33 (subjective intent irrelevant); *see Walton,* 159 Ariz. at 587, 769 P.2d at 1033 (upholding the trial court's finding of cruelty based on the victim's prewound mental anguish, without regard to foreseeability, even though there was a single mortal wound).

We find that the victim's postwound suffering was foreseeable. This was not a wound that typically kills or disables instantly like a gunshot to the head. *See Walton,* 159 Ariz. at 587, 769 P.2d at 1033 (finding that defendant could not have foreseen that the victim would live for as long as he did after gunshot wound to the head); *State v. Smith,* 146 Ariz. 491, 504, 707 P.2d 289, 302 (1985) (same). The fatal wound was a stab wound. Defendant must have known, or at least should have known, that the wound would be painful and that the victim would not die immediately. It makes no difference that the trial court did not expressly refer to foreseeability in its special verdict. The foreseeability of the victim's suffering was not disputed below, and there is no requirement that foreseeability be addressed in every special verdict where the court finds cruelty. We conclude that the state proved beyond a reasonable doubt that the murder was especially cruel.

Because a finding of cruelty is sufficient to establish the (F)(6) aggravating factor and because we concur in the trial court's finding of cruelty, we find it unnecessary to resolve any of the disputes between the parties concerning the elements of heinousness or depravity. *See West,* 176 Ariz. at 448, 862 P.2d at 208; *Lopez,* 175 Ariz. at 411, 857 P.2d at 1265.

### 4. Mitigating Circumstances

■■■■ Defendant argues that the trial court failed to consider all the evidence offered in mitigation. The sentencing judge must consider "any aspect of the defendant's character or record and any circumstance of the offense relevant to determining whether a sentence less than death might be appro-

priate." *State v. McCall,* 139 Ariz. 147, 162, 677 P.2d 920, 935 (1983), *cert. denied,* 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984); *see also* A.R.S. § 13–703(G) (Supp. 1994). Defendant must establish mitigating factors by a preponderance of the evidence. *State v. Fierro,* 166 Ariz. 539, 551, 804 P.2d 72, 84 (1990). The trial court has discretion in deciding how much weight to give the mitigating factors that the defendant offers. *Atwood,* 171 Ariz. at 648, 832 P.2d at 665. On appeal, we review the record independently to determine the existence or absence of aggravating and mitigating circumstances. *Gillies,* 135 Ariz. at 511, 662 P.2d at 1018.

■■■■ Defendant claims first that the trial judge did not consider all the evidence presented in mitigation. We conclude that he did. At the mitigation hearing, defendant called several witnesses, including his sister and two clinical psychologists. At sentencing, defendant presented argument based on evidence presented both at the mitigation hearing and at trial. The record clearly shows that all evidence and argument relevant to the mitigating circumstances, statutory and nonstatutory, was before the court when it rendered its verdict. At that time, the court stated, "[T]he Court has considered all mitigating factors proffered by the Defendant. In particular, the age of the Defendant at the time of the murder, and also the Defendant's emotionally deprived childhood. The Court finds there are no mitigating factors sufficiently substantial to call for leniency." A more extended explanation would have been helpful. In *State v. Leslie,* 147 Ariz. at 49–50, 708 P.2d at 730–31, we pointed out that the better practice is for the trial court to place on the record a list of all factors offered by a defendant in mitigation and then explain the reasons for accepting or rejecting them. In the more recent case of *State v. Gallegos,* 178 Ariz. 1, 22, 870 P.2d 1097, 1118, *cert. denied,* —— U.S. ——, 115 S.Ct. 330, 130 L.Ed.2d 289 (1994), decided after the sentencing in this case, we reiterated that advice. In this case, based upon our review of the record, we find it unnecessary to remand for sentencing, *see id.* (remanding for resentencing where trial judge failed to consider mitigating evidence of some weight),

but we again urge trial judges in capital cases to refer to and follow the procedure recommended in *Gallegos.*

We move then to our independent review of the record to determine the existence of aggravating and mitigating factors. We have already concluded that the trial court properly found that defendant committed the murder in an especially cruel manner. *See supra* part III(3). The respective ages of defendant (nineteen) and the victim (two years, eleven months) conclusively establish the section 13–703(F)(9) aggravating factor as well.

Defendant contends that seven mitigating circumstances were present: (1) defendant's capacity to conform his conduct to the requirements of the law was significantly impaired; (2) defendant suffered an impaired and abusive childhood; (3) defendant's age; (4) defendant could not have reasonably foreseen that his conduct would create a grave risk of death; (5) another person committed the murder; (6) defendant had been institutionalized throughout his childhood; and (7) and defendant's conviction was for felony murder, not premeditated murder. We discuss each offered mitigating factor and conclude that defendant's sentence of death is appropriate.

### (a) Impaired Capacity to Conform Conduct

▉ Defendant argues that he suffers from mental health problems that significantly impaired his capacity to conform his conduct to the requirements of the law. *See* A.R.S. § 13–703(G)(1) (Supp.1994). Two psychologists testified at the mitigation hearing. Philip Balch, Ph.D., who examined defendant in 1981 when he was fifteen years old, testified that at that time defendant showed aggressive behavior, difficulty controlling his temper, and impulse control problems. Defendant had an average intelligence quotient with disproportionately low verbal skills, which sometimes suggests organic brain difficulties. Defendant was behind academically and appeared to be learning disabled. Dr. Balch diagnosed defendant, first, as being seriously emotionally handicapped, and second, as having conduct disorder unsocialized aggressive with impulse control problems, a diagnosis for people under eighteen

who show a pattern of difficulties in conforming to typical societal age-related expectations and who pose a threat to people or property.

Todd Flynn, Ph.D., who examined defendant to determine his competency to waive his presence at the mitigation hearing, testified that defendant had a history of conduct disorder unsocialized aggressive and adjustment disorder with depression, which means there was a severe precipitating event to which defendant reacted with above normal depression. Defendant told Dr. Flynn that he had used drugs and started using alcohol excessively at age sixteen or seventeen. Dr. Flynn testified that a Department of Corrections evaluation completed four months after the kidnapping and murder of the victim stated that defendant showed no signs of depression and showed no signs of gross psychotic pathology. He also testified that from his own examination, defendant showed no signs of any mental defect, *e.g.,* impaired intelligence, mental retardation, or organic brain dysfunction. According to Dr. Flynn, defendant had a clear ability for basic rational thought, abstract philosophical thinking, and logical thinking. Dr. Flynn found neither acute emotional disorder nor any defect in intelligence or cognitive processing ability.

From this evidence, defendant has not proved that his capacity to conform his conduct to the requirements of the law was significantly impaired. There is no evidence that defendant was intoxicated other than his own self-serving testimony that he had consumed alcohol, marijuana, and cocaine on the evening of the murder. *See State v. Gerlaugh,* 144 Ariz. 449, 461–62, 698 P.2d 694, 706–07 (1985) (self-serving testimony insufficient to prove intoxication).

▉ Defendant had clear capacity for rational thought, and there is no evidence of any mental illness. Dr. Balch reported that defendant's disproportionately low verbal skills "may also be suggestive of some possible organic impairment." This very equivocal opinion, however, is unsupported by any neurological testing and is contradicted by Dr. Flynn, who found no signs of mental defect, including organic brain dysfunction.

Defendant has proved at most that at some time he suffered from a conduct disorder with impulse control problems. A conduct disorder, however, is not sufficient to constitute a mitigating circumstance. *See Gerlaugh,* 144 Ariz. at 459, 698 P.2d at 704. The evidence shows that defendant was capable of rational thought, and none of defendant's experts testified that defendant's capacity to conform to the law was ever impaired.

#### (b) Defendant's Abusive Childhood

 Defendant suffered severe emotional and physical abuse as a child. There was ample testimony from defendant's sister and the psychologists that defendant's mother and father lacked parenting skills, were cruel to defendant, and regularly inflicted physical abuse upon defendant. A difficult family background, however, is not always a mitigating circumstance. *State v. Wallace,* 160 Ariz. 424, 427, 773 P.2d 983, 986 (1989), *cert. denied,* 494 U.S. 1047, 110 S.Ct. 1513, 108 L.Ed.2d 649 (1990). If it were, many homicide defendants could point to some circumstance in their background that would call for mitigation. *Id.* A difficult family background is a relevant mitigating circumstance if a defendant can show that something in that background had an effect or impact on his behavior that was beyond his control. *Id.*

 Defense counsel argued at sentencing that defendant's abusive childhood directly impacted his ability to cope and contributed to his impulse control problems. Even if that were true, it would not help to explain the behavior at issue here. These crimes were anything but impulsive. Defendant also has not proven that the effect, if any, was beyond his control. Defendant had been referred to counseling and a group home, but he did not take advantage of opportunities to receive therapy. The remedy for child abuse is to submit to therapy, not to abuse others and to ask, in return, to be excused. *Atwood,* 171 Ariz. at 655, 832 P.2d at 672.

#### (c) Defendant's Age

 Defendant was nineteen years old at the time of the murder, which was some five years before his trial. Under section 13–703(G)(5) (Supp.1994), defendant's age is a mitigating factor. Under the circumstances of this case, however, we give it little mitigating weight. When addressing the issue of young age, we look at the defendant's level of maturity, judgment, past experience, and involvement in the crime. *Atwood,* 171 Ariz. at 652–53, 832 P.2d at 669–70; *Greenway,* 170 Ariz. at 170, 823 P.2d at 37; *Walton,* 159 Ariz. at 589, 769 P.2d at 1035; *Gerlaugh,* 144 Ariz. at 461, 698 P.2d at 706. When he murdered the victim, defendant had previously been incarcerated as a juvenile for aggravated assault, had a prior felony conviction for aggravated battery, and was awaiting trial for burglary. Such a history undermines the mitigating weight of defendant's age. *Atwood,* 171 Ariz. at 652–53, 832 P.2d at 669–70.

Furthermore, defendant planned and committed this crime on his own and did so in a very deliberate way. "[C]arrying out a plan over a significant period of time reflects delay of gratification, which in turn evidences relative maturity; impulsive acts reflect relative youth and immaturity." *Walton,* 159 Ariz. at 589, 769 P.2d at 1035. As we noted earlier, defendant's crimes were anything but impulsive. The sequence and duration of events on the night the victim was kidnapped and murdered show a deliberateness that contradicts any claim of immature impulsiveness.

#### (d) Other Offered Mitigating Factors

 Defendant argues that he has proven the statutory mitigating factor that he could not have reasonably foreseen that his conduct would create a grave risk of causing death because he did not know that his burglary accomplice would return to kidnap and kill the victim. A.R.S. § 13–703(G)(4) (Supp. 1994). We disagree. The jurors found that the defendant acted alone in kidnapping and killing the victim, and there was no evidence other than defendant's testimony that linked any other suspect to these crimes. Defendant stabbed the victim in the chest. A reasonable person would foresee that this conduct would create a grave risk of death.

Defendant argues that "fingerprint, footprint, and serological evidence show that an-

other person likely inflicted the fatal wound." It did not. The physical evidence indicated only that other people had once been at the victim's window and in the abandoned taxicab. Again, nothing but defendant's testimony links any other suspect to the murder.

Defendant argued at sentencing that his repeated institutionalization as a youth should be considered in mitigation. He did not, however, explain why, and he does not raise the argument on appeal. We conclude that defendant has not proved that his institutionalization should be a mitigating circumstance.

Finally, defendant argues that his conviction for felony murder, not premeditated murder, should be considered in mitigation because it indicates that the jury thought someone else actually killed the victim and that defendant was a mere accomplice. We have already said that the jury necessarily found that defendant himself killed the victim. The evidence does not show that someone else was involved. Therefore, we reject the suggestion that the jury thought someone else killed the victim.

### 5. Failure to Make a Separate *Enmund/Tison* Finding

Defendant argues that because the jury found him guilty of felony murder, there was no finding beyond a reasonable doubt that defendant killed, attempted to kill, or intended to kill the victim. Absent such a finding, punishment by death is unconstitutional. *Enmund v. Florida*, 458 U.S. 782, 797, 102 S.Ct. 3368, 3376, 73 L.Ed.2d 1140 (1982). Defendant's claim is without merit. Given the jury instructions, the jury necessarily found beyond a reasonable doubt that defendant himself killed the victim. That finding satisfies *Enmund*. *See Atwood*, 171 Ariz. at 650, 832 P.2d at 667.

### 6. Failure to Consider the Giving of a Felony Murder Instruction As a Mitigating Factor

Defendant argues that the trial court should have considered the giving of a felony murder instruction as a mitigating factor. The giving of a felony murder instruction is a mitigating circumstance only where there is some doubt as to the defendant's specific intent to kill. *Gillies*, 135 Ariz. at 513, 662 P.2d at 1020. It is not relevant to mitigation where the defendant knew with substantial certainty that his conduct would cause death. *State v. Zaragoza*, 135 Ariz. 63, 70, 659 P.2d 22, 29, *cert. denied*, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1356 (1983). Defendant stabbed the victim in the chest and left her hidden in the back of an abandoned automobile. He must have known that his conduct would cause death. Thus, the giving of a felony murder instruction is not a relevant mitigating factor.

### 7. Family Impact Statement

At sentencing, the trial court heard statements from the victim's parents, primarily the victim's mother. She described her grief and expressed frustration with defendant's failure to show remorse. She then expressed her wish that defendant die the same way that the victim died, describing her perception of the abduction and killing in graphic detail. The mother closed by saying that defendant ought to receive "the maximum sentence that this Court will allow." The victim's father endorsed the mother's testimony and also asked that the court "hand down the strictest and most punitive sentencing allowable by law."

Defendant argues that admission of these statements violated his right to due process of law and his right against infliction of cruel and unusual punishment. We acknowledge that family testimony concerning the appropriate sentence may violate the Constitution if presented to a capital sentencing jury. *See Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). We also acknowledge that victim impact testimony is not relevant to any of our statutory aggravating factors. *Atwood*, 171 Ariz. at 656, 832 P.2d at 673.

We nonetheless find no reversible error. Defendant, like all criminal defendants in Arizona, was sentenced by a judge, and the judge expressly stated on the record that he would consider the parents' statements only

in connection with the noncapital counts. Absent evidence to the contrary, we have assumed that the trial judge in a capital case is capable of focusing on the relevant sentencing factors and setting aside the irrelevant, inflammatory, and emotional factors. *Id.* at 657, 832 P.2d at 674. Given this assumption and the trial judge's express avowal, we find no error.

## 8. Proportionality Review

Defendant claims that his sentence of death is disproportionate. This court no longer conducts proportionality reviews. *Salazar,* 173 Ariz. at 417, 844 P.2d at 584.

## DISPOSITION

We have considered all the issues appropriately raised by defendant and find that defendant's convictions are proper. We have conducted an independent review of defendant's sentence of death and find it appropriate. We have searched the record and found no fundamental error. *See* A.R.S. § 13–4035 (1989). We therefore affirm defendant's convictions and sentences.

FELDMAN, C.J., and CORCORAN, ZLAKET and MARTONE, JJ., concur.

## APPENDIX A

The issues listed in this appendix are waived for failure to raise them below.

1. Whether it is unconstitutional for a trial court's voir dire of potential jurors to lack precise uniformity;

2. Whether the trial court should have excluded evidence of an Illinois prior conviction because it was not a crime punishable by death or imprisonment in excess of one year or a crime involving dishonesty or false statement;

3. Whether use of defendant's prior convictions to impeach his credibility violated defendant's right to due process of law;

4. Whether introduction of expert testimony based on the "phenomenon" of child sex murderers who try to restore their victims took defendant by surprise, violated defendant's right to confrontation and due process, or constituted impermissible application of a specialized theory to the facts of a particular case;

5. Whether admission of a buck knife identified as defendant's was inflammatory and denied defendant a fair trial;

6. Whether the trial court should have declared a mistrial because of prosecutorial misconduct where the prosecutor (a) allegedly commented on defendant's invocation of the Fifth Amendment privilege; (b) allegedly engaged in prosecutorial vouching; (c) allegedly misstated the law; (d) allegedly implied that defendant had a more extensive criminal history than admitted; (e) allegedly attempted to inflame the passion of the jury; and (f) allegedly misstated the evidence by (i) calling the victim's panties blood soaked, (ii) describing the victim's family in favorable terms, (iii) arguing how footprint evidence could corroborate the state's theory of how the crime was committed; (iv) informing the jury that the victim had been raped; and (v) arguing that semen stains were "mixed with the same blood" as the victim;

7. Whether the judge should have given a *Willits* instruction based on the alleged loss or destruction of hairs on a hairbrush, the label of a pizza box, a cigarette butt, the victim's panties, a stain found on the taxicab, and serological and DNA analysis;

8. Whether the trial court's definition of reasonable doubt was erroneous or unconstitutional;

9. Whether defendant's absence from an in-chambers discussion regarding jury instructions violated his constitutional right to be present at every stage of his trial;

10. Whether determination of aggravating circumstances by a judge rather than a jury violated defendant's right to equal protection under the law;

11. Whether use at sentencing of defendant's unwarned statements given during a court-ordered psychological

evaluation violated his Fifth Amendment privilege against compelled self-incrimination.

## APPENDIX B

The issues listed below are waived for lack of argument on appeal and for lack of sufficient reference to the record.

1. Whether certain events "coupled with" pretrial publicity denied defendant a fair trial. Defendant lists several "events," but does not explain how any of them relate to pretrial publicity or how any of them affected the conduct of his trial.

2. Whether the court should have stricken five jurors for cause. Without any reference to the record, defendant offers a list of assertions pertaining to five jurors with no explanation of why they amount to error.

3. Whether the trial court should have submitted defendant's questionnaire to the jury. Defendant does not reveal what the questions were, what information the questionnaire would have yielded, or how refusing to distribute it affected jury selection.

4. Whether the judge should have allowed evidence of "the drug rip-off motive and Brian Larriva theory" to be admitted. We can divine no coherent argument from this section of defendant's opening brief.

5. Whether the late disclosure of expert footprint evidence denied defendant a fair trial. Defendant claims that the state disclosed footprint evidence late, but does not explain how it was late, or, if it actually was late, how the late disclosure affected his trial.

6. Whether the trial court should have excluded a buck knife allegedly belonging to defendant. Defendant claims that the search warrant used to seize the knife failed to describe the items to be seized and was stale, but he does not explain. He does not describe the warrant or the circumstances under which police obtained the warrant and seized the knife.

7. Whether the trial court should have bifurcated defendant's sentencing on the capital and noncapital convictions. Defendant makes a series of apparently random assertions without explaining how they relate to bifurcation. Again, we are unable to divine any coherent argument.

8. Whether it was error for the trial court to draft its special verdict before the sentencing hearing. Defendant offers no explanation of how this practice violates due process or the Eighth Amendment.

Also waived for lack of sufficient argument on appeal are all the arguments raised only in the appendices to defendant's opening brief. They are:

1. Whether the death penalty is per se unconstitutional;

2. Whether execution by lethal gas is cruel and unusual punishment;

3. Whether Arizona's death penalty statute is unconstitutional because: (a) it requires a sentence of death whenever at least one aggravating factor and no mitigating factors are found; (b) it does not give a defendant an opportunity to death qualify the sentencer; (c) it fails to give guidance to the sentencing court; (d) it requires defendants to prove mitigating circumstances; (e) it does not require the sentencer to consider multiple mitigating factors collectively; (f) it does not require the trial court to make specific findings on each offered mitigating factor; (g) it does not sufficiently channel the sentencer's discretion; (h) it does not require the state to prove that the death penalty is appropriate; (i) the aggravating circumstance of cruel, heinous, or depraved is vague; (j) it limits full consideration of mitigating evidence; (k) there are no standards to guide the state's discretion in seeking the death

penalty; (*l*) it has been applied discriminatorily against poor, young males whose victims are caucasian;

4. Whether the trial court improperly imposed an aggravated sentence for defendant's noncapital convictions;

5. Whether the trial court improperly imposed consecutive sentences for defendant's noncapital convictions.